## UNITED STATES *v.* WELLS ET AL., EXECUTORS.

No. 252. Argued March 13, 1931.—Decided April 13, 1931.

*Assistant Attorney General Rugg,* with whom *Solicitor General Thacher* and *Messrs. H. Brian Holland* and *Erwin N. Griswold* were on the brief, for the United States.

104

*Mr. W. W. Spalding* for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

John W. Wells, a resident of Menominee, Michigan, died on August 17, 1921. The Commissioner of Internal Revenue assessed additional estate taxes, upon the ground

that certain transfers by the decedent within two years prior to his death, were made in contemplation of death and should be included in the taxable estate under the provisions of § 402 (c) of the Revenue Act of 1918, 40 Stat. 1057, 1097. The amount of the additional tax was paid by the executors and claim for refund was filed. The claim having been rejected, the executors brought this suit in the Court of Claims to recover the amount paid. The Court of Claims decided in favor of the executors, 69 Ct. Cls. 485; 39 F. (2d) 998, and this Court granted a writ of certiorari.

The substance of the findings of the Court of Claims with respect to the circumstances of the transfers may be stated as follows:

The decedent died at the age of seventy-three years; his wife and five children, three sons and two daughters, survived him. When a young man he became interested in the business of acquiring and selling timber lands and of manufacturing lumber. He continued in that business to the time of his death.

As early as the year 1901, decedent began the making of advancements of money and other property to his children. He kept a set of books on which he charged to his children some, but not all, of the amounts transferred to them. The decedent believed that the appropriate course for a man of wealth was to give to his children substantial sums of money during his lifetime while he could advise with them as to its proper use. He informed one of his friends: " I am making distribution from time to time of part of my property to see what my children will do during my lifetime, and I will then know when my time is up what I ought to do with the balance." [1]

---

[1] Speaking of a less liberal policy of a former business associate, who died in or about the year 1918, decedent frequently expressed his opinion that his friend " had made a big mistake in not distributing his property to his children while he was alive to help them handle it properly and said ' that is not my policy.' "

106

In 1918, decedent advanced to three of his children, Ralph W. Wells, Mrs. Edna Walsh, and Mrs. Florence Law, shares of stock in the Dunbar & Wausaukee Railway Company for which he charged each of them, in the equalization hereafter mentioned, the sum of $25,460. Neither this transfer, nor any of the earlier transfers, is in controversy.

In December, 1919, decedent transferred to his son Artemus C. Wells, 343 shares, and to his son Daniel Wells, 73 shares, of the stock of the J. W. Wells Lumber Company. He charged Artemus with $89,180, and Daniel with $18,890, on account of these transfers.

On January 1, 1921, after carefully examining his accounts in preparing for the final equalization of the prior advancements, decedent transferred to his children 68,985 shares of the stock of the Girard Lumber Company. His summaries of accounts with each of his children showed debit balances, on which he had computed interest, as follows: Daniel Wells, $266,530; Artemus C. Wells, $231,651; Ralph W. Wells, $214,008; Mrs. Florence Law, $216,445; and Mrs. Edna Walsh, $180,662. The decedent endorsed each of these statements with the words "Account with ————" " this account is canceled and ledger balanced to date as a gift to ————" (the name of the son or daughter being inserted), or with other words to the same effect.

In this process of equalization decedent charged his children with a total of 3458 shares of the capital stock of the Lloyd Manufacturing Company. These shares were not delivered at that time, as decedent had agreed to exchange them for a like number of shares in a new company to result from an expected merger. On January 26, 1921, decedent transferred to Marshall B. Lloyd, as trustee for the benefit of his wife and five children, 3713 shares of the stock of the Lloyd Manufacturing Company with authority to exchange these shares for shares of the stock of the new corporation, on the issue of which the trustee

was to assign the shares to decedent's wife and children, respectively, in designated amounts, or, in the event that the exchange was not consummated before December 1, 1921, to distribute to them the shares of the Lloyd company.[2]  On April 6, 1921, Lloyd, the trustee, distributed the certificates for the shares in the new company, but the finding states that the decedent had divested himself of all interest in the 3713 shares of the Lloyd stock when they were transferred in trust.

The transfers which the Commissioner deemed to be subject to the additional estate tax are these:

That of December, 1919, to his sons Daniel and Artemus, of 416 shares of the stock of the J. W. Wells Lumber

[2] On the day that this trust agreement was made, decedent wrote to his son Ralph (then in England): "I am going to divide Lloyd pref. stock and most of G. L. Co. (Girard Lumber Co.) among you children at once so you will have enough to keep you from hunger at least. I own now 5103 Lloyd stock, $100 per share. Income $35,721. I am going to even up my gifts to all now, and the following is the way they stand before the evening up" (inserting statement). "I have charged all of you interest on your accounts at 5% and I have charged you and Art $50,000 apiece for motor loss and credit you for W. P. L. Co. stock charged you. I am mighty busy getting ready for the West, so good-bye."

On February 3, 1921, on leaving for California, decedent wrote to his daughter, Mrs. Edna Walsh: "I have been working on my books and evening up all your accounts. Dan, Art, and Ralph have had advances that were more than you and Florence had and I have equalized one with the other by charging each with what they have had and charging them interest on the account to date, and the inclosed sheet shows what each has had and how I equalized your a/cs by giving stock to even. Your Lloyd stock will be delivered as soon as the deal is closed, which will be very soon. Your Lloyd stock is worth $108,600 and the Girard stock is worth $252,000, so you need not take in washing for support unless you throw it away on copper or other junk. In making out these accounts, the thing that seems most important is how interest runs up. Good safe bonds are the best investment for a person who does not understand business. Well, my dear girl, take good care of this, remember the poor and needy, and you will receive your reward. Good-bye."

Company, increased by a subsequent stock dividend to 1280 shares at the date of the decedent's death;

That of January 1, 1921, to his children, of 68,985 shares of the stock of the Girard Lumber Company;

That of January 26, 1921, in trust for his wife and children, of 3713 shares of the stock of the Lloyd Manufacturing Company.

The aggregate value at the time of the decedent's death of all the property embraced in these transfers was $782,-903. Excluding this property, the value of decedent's estate at the time of his death was $881,314.61, on which the decedent's annual income was approximately $50,000 a year.

The Court of Claims made detailed findings as to the state of decedent's health. It appeared that for some time prior to the year 1919, he had suffered from attacks of asthma. In May of that year he went to a hospital in Chicago for treatment and remained eleven days. About the middle of April, 1920, decedent began to be afflicted with ulcerative colitis, a condition in which the large intestine becomes inflamed. The finding states: " It is a curable disease. About eighty to eighty-five per cent. of the cases are cured." In June, 1920, decedent was advised by physicians in California that he was suffering from cancer of the intestines. In the following July, decedent again entered the hospital in Chicago and, on an examination by a specialist in diseases of the bowels, the case was diagnosed as ulcerative colitis. Between July and September, 1920, decedent was informed in detail of his condition. His physician told him that " he would get well."

While at the hospital, following an inquiry by his business associate, Marshall B. Lloyd, whether decedent had made any agreement with his second wife, Katherine Wells, with reference to a division of property after his death, decedent made such an agreement. Reciting his

illness, it provided that his wife " should have $100,000 in money and certain other property in lieu of her statutory and dower rights." Mrs. Wells ratified all gifts theretofore made by the decedent to his children and all gifts which might be made to his children thereafter " and before his death whether any of such gifts be made in contemplation of his death, or otherwise." Pursuant to the agreement, decedent made his will on August 18, 1920, the provisions of which differed only slightly from those of an earlier will. After providing for the payment of $100,000 to his widow and making other bequests, decedent devised his residuary estate to his five children, with the proviso: " Provided, however, that the amount shown to be due me from each of my children severally in accordance with my books at the time of my death, shall be considered advancement made by me to them from time to time and shall be chargeable to each of them severally as advancements and shall be deducted from their respective shares."

On September 14, 1920, decedent wrote to his son Ralph: " The doctors say that I will be absolutely cured if I am careful for two or three months after leaving and I certainly will be careful after this." [3]

On September 22, 1920, decedent was discharged from the hospital in an improved condition. His medical adviser stated that decedent's condition was " excellent,"— " he had not fully at that time recovered but he did within the next two or three months." " His appearance was normal; he had gained an appreciable amount of weight " and " he was in a very fair state of health." On his return to Menominee, decedent said to his son, who had been in charge of his affairs during his absence, that

---

[3] At about this time, the hospital physician found marked evidence of an inflammation of the ethmoid cells which are connected with the nasal cavity, and concluded that there was very likely a close relation between the ethmoiditis and the asthma.

" he was completely cured of the trouble that he had had and he felt good." Decedent then resumed his normal business activities.[4]

Decedent was again admitted to the hospital in Chicago, on November 30, 1920, for the purpose of an operation to relieve his asthma. His physician stated that at that time " he found him to be in good general condition." [5] On December 9, 1920, decedent was discharged from the hospital and returned to his home. He went back to the hospital on January 10, 1921, for the completion of the nasal operation.[6] At the time of his discharge on January 14, 1921, the medical examination showed " ' a very greatly improved condition ' and that in respect to the ulcerative colitis it was ' 90 per cent. normal.' "

On January 26, 1921, the date of the trust agreement (constituting the last of the transfers in question) decedent wrote to his son Ralph: " The doctors pronounce me cured of bowel trouble, but I will always have asthma. I weigh 140 stripped." On February 3, 1921, he left for California, where he was accustomed to spend the winter months. His physician stated that decedent at that time " considered himself well, and I told him that he need have no anxiety whatever about his state of health;

---

[4] Writing to his son Ralph on October 30, 1920, decedent said: " I am around about the same as usual. . . . I feel as well as ever, and bowels seem normal, but doctor says I must diet and take bismuth medicine for a while and be careful. Gained six pounds since I came home."

[5] The physician said that decedent " came to the hospital for treatment of the asthma, not for the bowel trouble. . In fact, it was by arrangement when he left the hospital in September that he came back at this time, in November, to have the operative work done on the nose that was designed to clear up the asthma."

[6] His physician then made the following entry in the hospital record with respect to decedent's condition: " In general feels very well. Gained six pounds in weight. Asthma has been somewhat troublesome at times. Has had very good bowel function. No pain. Returns for completion of nasal operation."

that I considered him in excellent condition; that he need have no fears of any recurrence of the ulcerated colitis."[1]

But in April, 1921, while still in California, decedent had such a recurrence. He consulted a specialist of reputation who after examination informed him that he might have a cancer, and advised an operation. In June, 1921, decedent reëntered the hospital in Chicago. His condition proved to be due to a virulent form of infection that failed to yield to treatment. Returning to his home, he continued to lose ground and he died on August 17, 1921. An autopsy disclosed a severe and extensive inflammation of the large intestine, with ulceration of the bowel. No trace of cancer was found. The death certificate signed by his physician set forth the cause of decedent's death as " suppurative colitis " and its " duration one year."

The Court of Claims did not find, in terms, that the transfers in question were not made in contemplation of death, but it is evident that the court considered that its findings of fact amounted to that in substance, in view

[1] In February, 1921, friends of the decedent, visiting him in California, were taken by him on extended motor trips. " Decedent drove the car himself through the congested portion of the city (Los Angeles), as well as around or over the mountains near that city. At places on these mountain roads the automobile party driven by the decedent traversed roads that ran along a precipice where there is a sheer fall of six or seven thousand feet without any apparent concern or distress on the part of the decedent." His friends " did not see any difference in his appearance. He seemed to be just as spry as he ever was, and handled the car in pretty good shape." He was thought to be " very cheerful."

In a letter dated February 21, 1921, written to his children, decedent said: " I am about free of my bowel trouble, but have my old complaint, asthma, but I have taken treatment at Batch Creek Treatment Rooms here the last two years and they have cleared it up and they are now treating me and it is clearing up."

of the conclusion of law, based upon these findings, that the executors were entitled to recover the additional tax. This is also manifest from the reasoning of the court's opinion. The court said [p. 513]:

" The plaintiffs have not only overcome the presumption created by the statute that the transfers were made in contemplation of death but have definitely established the fact that the immediate and moving cause of the transfers was the carrying out of a policy long followed by decedent in dealing with his children of making liberal gifts to them during his lifetime. He had consistently followed that policy for nearly thirty years and the three transfers in question were a continuation and final consummation of such policy. In the last transfer such amounts were given to his children as would even them up one with another, in the gifts and advancements made to them.

" That this was the motive which actuated the decedent in making these transfers seems unquestioned. He repeatedly, in letters to his children and in statements to business associates at about the time the transfers were made, gave this as his reason for such transfers.

"After the final transfer in which the advancements and gifts to the children were evened up in January, 1921, the decedent still possessed property of the value of nearly $900,000, from which he drew an annual income of approximately $50,000. At the time the transfers were made, decedent had no reason to believe otherwise than [that], aside from his asthma, he was, for a man of his age, in ordinary health. While he had gone through a most serious and painful illness, he had, as he believed, made an almost complete recovery. He was assured of this fact by his physician, an eminent specialist, in whom he had great confidence. The repeated statements made by him to close friends and associates, his daily activities in matters connected with his business affairs, his letters to his children assuring them of his renewed health, show

that he fully believed the assurances given him by his physician that he was cured and had nothing to fear on account of his former illness.

"The presumption created by the statute that the transfers in question were made in contemplation of death can not stand against ascertained and proven facts showing the contrary to be true. The best evidence of the state of the decedent's health at the time the transfers were made is the statement of his doctor. The best evidence of the decedent's state of mind at that time and the reasons actuating him in making the transfers are the statements and expressions of the decedent himself, supported as such statements are by all the circumstances concerning the transfers." [8]

The Government contests the decision of the Court of Claims upon the ground that the conclusion was reached by an erroneous construction of the words " in contemplation of death " as used in the statute. The court held that " ' contemplation of death ' does not mean that general knowledge of all men that they must die, but that

---

[8] Referring to the agreement made in the summer of 1920 with the decedent's wife as to her share of his property, and to the making of his will, the court said: "While these transactions are entitled to consideration in connection with all the other facts and circumstances shown, we do not regard them as having a great deal of weight in determining the question as to the decedent's state of mind and the motives actuating him in making transfers of property, four months later. No transfers of property were made to the children at the time of the execution of the property agreement with his wife, and the provisions made for their benefit in the will executed at that time were identical with the provisions of a former will. Whatever apprehensions the decedent entertained at the time of the making of the property agreement with his wife as to the chances of recovery from the illness from which he was suffering at that time, had ceased to exist before the transfer of the Girard Lumber Company stock on January 1, 1921, and the Lloyd Manufacturing Company stock on January 26, 1921."

there must be a present apprehension, from some existing bodily or mental condition or impending peril, creating a reasonable fear that death is near at hand, and that such reasonable fear or apprehension must be the direct or animating cause, and the only cause of the transfer." [9] The Government insists that this definition is too narrow; that transfers in contemplation of death are not limited to those induced by a condition causing expectation of death in the near future; that the character of such gifts is determined by the state of mind of the donor at the time they are made, and that the statutory presumption may be overcome only by proof that the decedent's purpose in making the gift was to attain some object desirable to him during his life, as distinguished from the distribution of his estate às at death.

---

[9] In support of this view, the court cited *Spreckels* v. *State*, 30 Cal. App. 363; 158 Pac. 549; *Shwab* v. *Doyle*, 269 Fed. 321; *Meyer* v. *United States*, 60 Ct. Cls. 474; *Rea* v. *Heiner*, 6 F. (2d) 389; and Starck, Executor, 3 B. T. A. 514. See, also, Phillips, Executor, 7 B. T. A. 1054; Stein, et al., Executors, 9 B. T. A. 486; Gimbel et al., Executors, 11 B. T. A. 214; George A. Wheelock's Estate, 13 B. T. A. 831; *Commonwealth* v. *Fenley*, 189 Ky. 480; 225 S. W. 154; *State* v. *Pabst*, 139 Wis. 561; 121 N. W. 351; *State* v. *Thompson*, 154 Wis. 320; 142 N. W. 647; *Gaither* v. *Miles*, 268 Fed. 692; *Vaughan* v. *Riordan*, 280 Fed. 742; *Flannery* v. *Willcuts*, 25 F. (2d) 951; *Beeler* v. *Motter*, 33 F. (2d) 788; *Rosenthal* v. *People*, 211 Ill. 306; 71 N. E. 1121; *People* v. *Burkhalter*, 247 Ill. 600; 93 N. E. 379; *People* v. *Carpenter*, 264 Ill. 400; 106 N. E. 302; *People* v. *Northern Trust Co.*, 324 Ill. 625; 155 N. E. 768; *Matter of Baker*, 83 App. Div. (N. Y.) 530; 82 N. Y. S. 390; affirmed 178 N. Y. 575; 70 N. E. 1094; *Matter of Palmer*, 117 App. Div. (N. Y.) 361; 102 N. Y. S. 236; *Matter of Baird*, 219 App. Div. (N. Y.) 418; 219 N. Y. S. 158. But, compare *Estate of Reynolds*, 169 Cal. 600; 147 Pac. 268; *Estate of Pauson*, 186 Cal. 358; 199 Pac. 331; *Chambers* v. *Larronde*, 196 Cal. 100; 235 Pac. 1024; *Armstrong* v. *Indiana*, 72 Ind. App. 303; 120 N. E. 717; *Matter of Crary*, 31 Misc. (N. Y.) 72; 64 N. Y. S. 566; *Matter of Price*, 62 Misc. (N. Y.) 149; 116 N. Y. S. 283; *Tax Commission* v. *Parker*, 117 Ohio St. 215; 158 N. E. 89; *Rengstorff* v. *McLaughlin*, 21 F. (2d) 177.

The phrase " in contemplation of death," previously found in state statutes, was first used by the Congress in the Revenue Act of 1916, imposing an estate tax. It was coupled with a clause creating a statutory presumption in case of gifts within two years before death.[10]   The provision was continued in the Revenue Act of 1918,[11] which governs the present case, and in later legislation.   While the interpretation of the phrase has not been uniform, there has been agreement upon certain fundamental considerations.   It is recognized that the reference is not to the general expectation of death which all entertain.   It must be a particular concern, giving rise to a definite motive.[12]   The provision is not confined to gifts *causa mortis*,

[10] 39 Stat. 756, 777, 778.

[11] 40 Stat. 1057, 1097. Section 402 (c) provides: " To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title; "

[12] Article 23 of Regulations 37, under the Revenue Act of 1918, contained the following:

"Art. 23. Nature of Transfer.—The words 'in contemplation of death' do not refer to the general expectation of death which all persons entertain. A transfer, however, is made in contemplation of death wherever the person making it is influenced to do so by such an expectation of death, arising from bodily or mental conditions, as prompts persons to dispose of their property to those whom they deem proper objects of their bounty. The cause which induces such bodily or mental conditions is immaterial; and it is not necessary that the decedent be in the immediate expectation of death. Such a transfer is taxable, although the decedent parts absolutely and immediately with his title to and possession of the property. Transfers

which are made in anticipation of impending death, are revocable, and are defeated if the donor survives the apprehended peril. *Basket* v. *Hassell*, 107 U. S. 602, 609, 610.[13] The statutory description embraces gifts *inter vivos*, despite the fact that they are fully executed, are irrevocable and indefeasible. The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant

---

made within two years of a decedent's death are presumed to be taxable if they are of a material part of his property and are in the nature of a final disposition thereof. . . . All facts relating to the transfer should be stated, including the motive therefor, the decedent's state of health, and his anticipation of death. The presumption of taxability may be rebutted by proof that the transfer was not induced by bodily or mental conditions leading the grantor to make a disposition of property testamentary in its nature. The fact that a gift was made as an advancement, to be taken into account upon the final distribution of the decedent's estate, is not enough, standing alone, to establish taxability; but it is a circumstance to be considered in determining whether the transfer was made in contemplation of death."

[13] In *Matter of Seaman*, 147 N. Y. 69, 76; 41 N. E. 401, the court, referring to the words "in contemplation of death" in the Inheritance Tax Law of New York, said that the clause "evidently referred to grants or gifts *causa mortis*." See also *Matter of Edgerton*, 35 App. Div. (N. Y.) 125; 54 N. Y. S. 700; affirmed 158 N. Y. 671; 52 N. E. 1124; *Matter of Spaulding*, 49 App. Div. (N. Y.) 541; 63 N. Y. S. 694; affirmed 163 N. Y. 607; 57 N. E. 1124; *Matter of Baker,* 83 App. Div. (N. Y.) 530; 82 N. Y. S. 390; affirmed 178 N. Y. 575; 70 N. E. 1094. But compare *Matter of Palmer*, 117 App. Div. (N. Y.) 361, 366, 367, 368; 102 N. Y. S. 236; *Matter of Crary,* 31 Misc. (N. Y.) 72, 75; 64 N. Y. S. 566; *Matter of Price*, 62 Misc. (N. Y.) 149, 151, 152; 116 N. Y. S. 283; *Matter of Dee*, 148 N. Y. Supp. 423; affirmed 161 App. Div. (N. Y.) 881; 145 N. Y..S. 1120; affirmed 210 N. Y. 625; 140 N. E. 1128; *Matter of Hodges*, 215 N. Y. 447; 109 N. E. 559.

purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. *Nichols* v. *Coolidge*, 274 U. S. 531, 542; *Milliken* v. *United States, ante,* p. 15. As the transfer may otherwise have all the indicia of a valid gift *inter vivos,* the differentiating factor must be found in the transferor's motive. Death must be " contemplated," that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death, is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death. But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor.

As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age

may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words " in contemplation of death "· mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is " near at hand."

If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts *inter vivos* which spring from a different motive. Such transfers were made the subject of a distinct gift tax, since repealed.[14] As illustrating transfers found to be related to purposes associated with life, rather than with the distribution of property in anticipation of death, the Government mentions transfers made " for the purpose of relieving the donor of the cares of management or in order that his children may experience the responsibilities of business under his guidance and supervision." The illustrations are useful but not exhaustive. The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is, not · only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular

---

[14] Revenue Act of 1924, §§ 319–324, 43 Stat. 253, 313, as amended by Revenue Act of 1926, § 324, 44 Stat. 9, 86. *Bromley* v. *McCaughn*, 280 U. S. 124. Revenue Act of 1926, § 1200 (a), 44 Stat. 9, 125, 126.

consideration of that event. . There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death.

It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in " contemplation of death," as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus give effect to the manifest purpose of the statute.

We think that the Government is right in its criticism of the narrowness of the rule laid down by the Court of Claims, in requiring that there be a condition " creating a reasonable fear that death is *near at hand,*" and that " *such* reasonable fear or apprehension " must be " the only cause of the transfer." It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near. But it does not appear that the decision of the court rests upon the limitation thus expressed. The court did not rely merely upon the fact that at the time of the transfers decedent considered that he had recovered from his former illness and believed the assurances given him by his physician that he need have no fear of its recurrence or any " anxiety whatever about his state of health." That fact was manifestly important, but, in addition to that, the court held that " the immediate and moving cause of the transfers was the carrying out of a policy, long followed by decedent in dealing with his children, of making liberal gifts to them during his lifetime." The court regarded the transfers in question as " a continuation and final consummation of such policy," saying " that this was the motive

which actuated the decedent in making these transfers seems unquestioned." In the view of the court as thus explicitly stated, not only was there no fear at the time of the transfers that death was near at hand, but the motive for the transfers brought them within the category of those which, as described by the Government, are intended by the donor " to accomplish some purpose desirable to him if he continues to live." In the presence of such a motive, appropriately found, and of the underlying facts which have been expressly found, there would be no ground for a reversal of the judgment merely because of an inaccuracy in the general statement as to the meaning of the statutory phrase.

The only difficulty presented by the record is that this statement with respect to the motive of decedent appears in the opinion of the court and not in its findings of fact. We are not at liberty to refer to the opinion for additional findings. The findings of fact of the Court of Claims are to be treated like the verdict of a jury.[15] We cannot add to them, or modify them, but the absence of the finding of an ultimate fact does not require a reversal of the judgment if the circumstantial facts as found are such that the ultimate fact follows from them as a necessary inference.[16]

It is evident that the court did not consider the statements in its opinion, which we have quoted, as additional findings of fact, but as an argument with respect to the conclusion to be drawn from its findings. In its opinion, the court was summarizing what it considered to be the effect of its findings, and no useful purpose would be served in returning the case for a specific finding that the motive which impelled the decedent to make the transfers

---

[15] *Stone* v. *United States,* 164 U. S. 380, 382, 383; *Crocker* v. *United States,* 240 U. S. 74, 78; *Brothers* v. *United States,* 250 U. S. 88, 93.

[16] *United States* v. *Pugh,* 99 U. S. 265, 269, 270; *Botany Mills* v. *United States,* 278 U. S. 282, 290.

was precisely that which the court has thus definitely stated. While, in accordance with proper practice and the rule of this Court,[17] the Court of Claims should have found the ultimate fact, and we do not approve the method it adopted, we are of the opinion that, in view of the findings of fact actually made and the conclusion they import, the judgment should be sustained.[18]

*Judgment affirmed.*

Mr. Justice Roberts took no part in the consideration or decision of this case.

---

[17] Rule 41.

[18] Act of February 26, 1919, c. 48, 40 Stat. 1181; U. S. C., Tit. 28, § 391.