NEAL et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 9062.

Circuit Court of Appeals, Eighth Circuit.

Nov. 17, 1931.

Phil D. Morelock, of Kansas City, Mo. (Shouse, Doolittle, Morelock & Shrader, of Kansas City, Mo., on the brief), for petitioners.

Hayner N. Larson, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Prew Savoy, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before STONE and VAN VALKENBURGH, Circuit Judges, and SANBORN, District Judge.

STONE, Circuit Judge.

Fernando P. Neal died February 20, 1924. The Commissioner of Internal Revenue assessed additional estate taxes, upon the ground that certain transfers by decedent to his children and to Miss Kelly (his secretary), made within two years of his death, were made in contemplation of death. The executors bring this petition to review an order of the Board of Tax Appeals redetermining the taxes as found by the Commissioner.

Three matters are presented by the petition: (1) That the evidence does not support the conclusion of the Board that any or all of these transfers were "in contemplation of death"; (2) that certain of the properties transferred were overvalued by the Commissioner and the Board; (3) that one property in the estate (real estate in Missouri) included for such taxation was not subject to the tax. The third matter is eliminated from our consideration by the concession of the respondent that it should have been excluded under the authority of Crooks v. Harrelson, 282 U. S. 55, 51 S. Ct. 49, 75 L. Ed. 156.

I. The transfers here involved are as follows: (a) In July, 1923, at the instigation of his son Marshall, Neal bought 800 shares of Phillips Petroleum Company stock for which he paid $20,800. This amount was charged to Marshall in Neal's general ledger and Marshall gave his note therefor. November 19th, Marshall wished to sell the stock and take a profit thereon but his father protested because he thought the stock would go higher. Marshall insisted that he was in debt far enough and wanted to sell, whereupon Neal admonished him not to worry, saying he was going to give him that stock and thereupon told his secretary to transfer the stock to Marshall and to return the note. This was done. (b) Christmas (1923) gifts to his three children of securities he valued at $126,406.73, and to his secretary (Miss Kelly) of securities worth $3,712.50.

Were these gifts made "in contemplation of death," as that expression is used in the statute (Revenue Act 1918, § 402(c), 40 Stat. 1057, 1097)? This is purely a question of fact. The fact sought is the controlling motive in the mind of Neal in making these gifts. U. S. v. Wells, 283 U. S. 102, 117, 118, 119, 51 S. Ct. 446, 75 L. Ed. 867. If that impelling motive was "the thought of death," that is, "the sort which leads to testamentary disposition" (U. S. v. Wells, supra, pages 117, 118 of 283 U. S., 51 S. Ct. 446, 451) then the gifts are within the statute and taxable; otherwise, they are not. The Commissioner has found the above motive. The Board has confirmed that finding. The burden was upon petitioners to establish the contrary before the Board [Reinecke v. Spalding, 280 U. S. 227, 232–233, 50 S. Ct. 96, 74 L. Ed. 385; Botany Mills v. U. S., 278 U. S. 282, 289, 49 S. Ct. 129, 73 L. Ed. 379; Feeders' Supply Co. v. Commissioner, 31 F.(2d) 274, 277 (C. C. A. 8); Avery v. Commissioner, 22 F.(2d) 6, 55 A. L. R. 1277 (C. C. A. 5)] and we cannot disturb the determination of the Board thereon if there is substantial evidence to support such determination [Franciscus Realty Co. v. Commissioner, 39 F.(2d) 583, 584 (C. C. A. 8); Kendrick Coal & Dock Co. v. Commissioner, 29 F.(2d) 559, 564 (C. C. A. 8); Denver Live Stock Comm. Co. v. Commissioner, 29 F.(2d) 543, 544 (C. C. A. 8); Avery v. Commissioner, 22 F.(2d) 6, 8, 55 A. L. R. 1277 (C. C. A. 5); Royal Packing Co. v. Commissioner, 22 F.(2d) 536, 538 (C. C. A. 9)]. Therefore, the question here is whether there was any substantial evidence before the Board to support its determination that the above gifts were made in contemplation of death.

The following is a condensed summary of the material evidence bearing upon the matter before us: At the time of his death (February 20, 1924), Mr. Neal was sixty-eight years old. For many years he had been a successful banker, but several years before his death he had retired from that business and was thereafter engaged in looking after his own investments and in participating, as a director or officer, in the affairs of several companies in which he had stock. The estimated value of the gross estate left by him was determined to be $733,215.27, and the net estate, for taxation, to be $544,652.06. Since leaving the banking business, he had transacted his business in a private office where he was in the

habit of spending the entire business day and where he was assisted by a clerk or secretary, Miss Kelly. His family consisted of two sons and a married daughter, all of whom had homes of their own and the sons being engaged in business for themselves. His wife had died in May, 1923.

For some years, it had been his custom to assist his children by loans and, apparently, he kept accounts with them as to his transactions of this character. In July, 1923, his son Marshall solicited a loan to buy 800 shares of the Phillips Petroleum Company stock. Mr. Neal bought this stock for $20,800, took his son's note therefor, entered the transaction on his books, and retained the stock. On November 19th, following, Marshall asked his father to sell this stock as it would afford him a profit. Mr. Neal protested against the sale because he thought the stock would go higher. Marshall insisted because he thought he was already indebted enough and that it would be wiser for him to take his profit and be released of this indebtedness, whereupon his father told him he need not worry about that matter as he intended giving him the stock and, at that time, he had his secretary return to Marshall his note, make a transfer of the stock, and balance that item of the account.

It had been the custom of Mr. Neal to give his children Christmas presents of substantial value. The exact nature and amount of these gifts is not shown in the testimony, beyond that a year or so prior to the World War he gave each of them $10,000, and about a year before he died $5,000 each. It is a fair inference from this state of the evidence that the two above occasions were exceptional in amount or there would have been detailed testimony concerning the gifts at other Christmas times. For several years prior to his death, he had talked of making a substantial Christmas gift to his children. He had also talked with several associates of the advisability of dividing part of his estate with his children so that he might observe how they handled their affairs and so that he might be able to advise and train them in that respect. On December 15, 1923, he wrote each of his children similar letters to the effect that it was his desire to make a substantial present to each of them at the ensuing Christmas and that he was advising them of his intention; that he wanted to transfer certain of his securities in equal parts; that there might be some delay in effecting the actual transfer by Christmas day, but that he hoped to do so by about January

1, 1924. The last paragraph of his letter to one of his sons reads as follows: "I hope you will keep this present intact as much as possible, and will enjoy the income therefrom the rest of your life. I trust you will see fit to, in turn, divide this gift between your children, when you get ready to provide for their welfare after you are gone." In pursuance of this intention, he transferred to the three children securities owned by him to the value (estimated by him) of $126,406.73, this transfer occurring very shortly after the 1st of January, 1924. At the same time, he gave to his secretary, Miss Kelly, securities of the value of $3,712.50.

The record shows Mr. Neal to have been a robust, energetic, intelligent man. At a time, not definitely stated but several months prior to November 19, 1923, while backing his car into its stall, he had suddenly had a shortness of breath, but recovered after ten or fifteen minutes and made no call for medical attention. On the evening of November 19, 1923, while backing and steering his car into its stall, he had an attack. This consisted of suffering severely with difficulty in breathing and coughing up frothy, bloody sputum. Two physicians were summoned who administered digitalis and morphine as supportive measures to the heart. The physicians kept Mr. Neal at his sister's house under observation until November 24th, absolutely at rest. On the latter date, he came to his doctor's office for a general examination, at which time the doctor permitted him to go to his office but instructed him to abstain from golfing or any severe physical exertion of any kind and to abstain from other forms of exertion like overeating or getting unduly excited or aroused. At that time his doctors thought there was no immediate danger and that, with the care which they prescribed, he would recover and live indefinitely. A part of this instruction was that he should not do any walking of any kind. Mr. Neal seems to have followed these instructions only partly and, on December 24th, when he walked to the doctor's office for examination, the doctor found him in a very grave condition and would not permit him to walk home but kept him in the office and telephoned his family to send a car for him. The doctor found his condition very serious at that time but, while he informed Mr. Neal's family of the real situation, he did not indicate it to Mr. Neal otherwise than by the instructions to him as to his care. On December 27th Mr. Neal was taken with convulsions and, upon a further examination at that time, his phy-

sician determined that he had a fatal illness with only a relatively short duration of life. The gravity of this situation was not communicated to Mr. Neal, although it was made known by the doctor to his family. Mr. Neal's son Marshall testified to the hopeful character of Mr. Neal and his plans for the future which continued up to the last, although the son testifies to receiving a letter from his sister concerning the attack of November 19th, where she had written that Mr. Neal "had cranked his car, and it had upset him terribly." Friends and business associates testified that, up to the end, Mr. Neal was cheerful, hopeful, and planning for the future, and that he kept up his active interest in his affairs and gave no indication of any knowledge or apprehension of approaching death. Under this evidence, the Commissioner and the Board might well have found either way. This evidence, with the natural inferences therefrom, leaves the matter of Mr. Neal's motive one of doubt and conflict. His action might have been prompted by his prior expressed purposes of training his children by giving them portions of his estate, without any thought of anticipating his own death whenever it might occur. On the other hand, there are the circumstances that theretofore it seems to have been his policy to loan them money and help guide their investments, rather than to give the money to them outright; that while he had, for years, been accustomed to make substantial Christmas presents to his children, yet only two of these are set forth in amount, the earliest one being $10,000 about ten years before, and $5,000 the year before; his wife had recently died and that he had had an indication of physical trouble within a few months after her death and, as to the Christmas presents here involved, had had a pronounced recurrence of that trouble on the 19th of November which had led to medical attention and a rather strict regime of conduct to be pursued by him; that the last paragraph of the letter to his son Clarence, which was concerning the Christmas gift, contains an indication that he had in mind a partial distribution in view of his death. Conceding that Mr. Neal may not have known the full gravity of his condition at the time he wrote these letters, yet it is impossible to escape the conviction that he could not believe that he was a well man. It may be that he had no idea that the end was so near or that his ailment was as critical as it proved to be, but he did know that he was in a condition which involved his heart and which required considerable care upon his part.

The situation as to Miss Kelly is further revealing. She had been with Mr. Neal for about fifteen years on a modest salary of $125 a month. This salary had been supplemented or aided by Mr. Neal by his lending her money to invest when he thought she had a good opportunity, and he saw that she more than made up for her lack of salary in the profits which he was able to help her obtain. This is in line with his policy toward his children in loaning them money and advising as to investment. There is no evidence of any gift of any character to her before this time. There is no reasonable explanation for his gift to Miss Kelly of his stock at this time except that he had in mind his possible death. While it is by no means determinative or even weighty in this matter, it is significant that neither Miss Kelly, who was most closely associated with him in his business and personal contact during the business day, nor his sister with whom he was for some days after the attack on November 19, 1923, each of whom would have been in a peculiarly advantageous position to know his feelings and reactions to his condition, was placed upon the stand.

Thus, it is clear that there was substantial testimony to support the determination of the Commissioner and of the Board. The situation here recalls the language of the Supreme Court in Burnet v. Houston, 283 U. S. 223, 228, 51 S. Ct. 413, 415, 75 L. Ed. 991, wherein that court said: "The impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof."

There is considerable discussion in both briefs regarding the effect of the statutory presumption that a transfer within two years of death is presumed to be made in contemplation thereof (40 Stat. 1057, 1097). It is unnecessary to resolve this matter as, irrespective of this statute, the burden is on the petitioners to show that a transfer found by the Commissioner to have been made in anticipation of death was not so made, and this court will not overturn a decision of the Board affirming such action of the Commissioner if there is substantial evidence in support thereof.

II. The evidence as to the claimed overvaluation of several items included in the above Christmas gifts is in conflict. In this situation we are not at liberty to disturb the determination of the Board.

### Conclusion.

The action of the Board in its order of re-determination should be affirmed, and this petition for review dismissed, with the instruction to the Board to eliminate from the property subject to this estate tax the item of the real estate in Missouri. It is so ordered.