PURVIN v. COMMISSIONER OF INTERNAL REVENUE.

No. 6474.

Circuit Court of Appeals, Seventh Circuit.

May 19, 1938.

Isaac B. Lipson, of Chicago, Ill., for petitioners.

930

James W. Morris, Asst. Atty. Gen., and J. Louis Monarch and F. E. Youngman, Sp. Assts. to Atty. Gen., for respondent.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

The petitioners, executors of the estate of Frederick C. Austin, deceased, seek to reverse a decision of the United States Board of Tax Appeals, affirming the Commissioner's determination that the value of certain annuities to relatives and friends of the decedent should be included in the latter's gross estate on the ground that they grew out of a contract constituting a transfer made "in contemplation of death" within the language of the act of Congress taxing such a transfer as part of a decedent's gross estate. Section 302 (c) of the Revenue Act of 1926, c. 27, 44 Stat. 9, 70, as amended by section 803 (a) of the Revenue Act of 1932, c. 209, 47 Stat. 169, 279, U.S.C. title 26, §§ 411 (c); Revenue Act of 1926, c. 27, §§ 313 (c), 315 (a, b), as amended, 26 U.S.C. § 427, 26 U.S.C.A. §§ 411(c), 427. The only question presented, then, is whether the Board was justified in finding that the transfer mentioned was made in contemplation of death.

The cause was tried upon stipulated facts. The Board found that Mr. Austin, the deceased, formerly a manufacturer of heavy road machinery, aged 78, died on June 11, 1931, as a result of paralysis and pneumonia, after an illness of some 18 months. He was a widower and had no children.

Some 11 years prior to his death, the decedent sold his business for $1,000,000. Thereafter he confined his activities to dealing in stocks and bonds and operation of an office building and warehouse, which he owned. The building he had purchased in 1922 and its fair market value in January, 1929, was from 2½ million to 3 million dollars, less, however, a mortgage for $1,000,000.

On January 23, 1929 Mr. Austin entered into an agreement with Northwestern University, as a result of which he conveyed the real estate to the University and it agreed to pay to him an annuity of $160,000 until the time of his death and, beginning three months after his death, to pay annuities of various amounts to some twenty-six of his relatives and friends. The property transferred was set up as the "F. C. Austin Scholarship Foundation," an endowment fund for the purpose of providing scholarships for students wishing to prepare for executive positions in industrial enterprises. It was provided that so much of the principal transferred as might be necessary to satisfy the annuities should be used for that purpose. The $160,000 payable annually to decedent was some $50,000 in excess of the average net income of the property. The annuitants were to have no power of assignment of the payments to be made to them.

On the same day the decedent executed his will, whereby he devised and bequeathed all of his estate, after payment of his debts, to Northwestern University as a special endowment fund to be added to the F. C. Austin Scholarship Foundation and to be used for the same purposes as the fund created by the contract. He added further that he was making no bequests or devises to friends and relatives, as he had "already made provision for them in another manner during his life time." "In making such provisions," he added, he had sought "not unduly to enrich any one but to bestow such amounts as would insure their reasonable maintenance for life," and to his relatives and friends who were "well provided for in this world's goods," he "left his love and good wishes."

The decedent had been, prior to said time, a man of good health, experiencing no necessity for medical services for some 12 or 15 years prior to the illness resulting in his demise. He had never discussed death or its imminence with Purvin, who was his closest associate and managed the financial, clerical, and office details of his business. In 1927 he purchased a home in Pasadena, Cal., for some $45,000, at which he thereafter spent about half of his time.

Immediately after executing his will and the contract with the University, he left Chicago for California and about November 1, 1929 experienced a slight stroke of paralysis. This, however, was not serious enough to interfere with a trip to Honolulu. He returned to the United States in December. On or about the 10th of that month he suffered a severe stroke which culminated in his death on June 11, 1931.

Under the terms of the agreement he transferred property having a gross value of from 2½ million to 3 million dollars to the University and made provisions for

annuitants of the then present cash value of $377,829.02. By his will he devised the remainder of the estate to the University.

The Board of Tax Appeals found that the two instruments, under the particular facts and circumstances disclosed, constituted a final scheme of complete distribution of his entire estate; that they were such as to put his house in order against the time of his death, making any further action with reference to the disposition of his property, unnecessary.

The Board concluded that the decedent was contemplating his own death when he made the will and the agreement; that the provision for annuities was of the type ordinarily contained in a will; that the absence of specific bequests and devises in the latter apparently called for an explanation, which he made. The Board found as a fact that the provision in the agreement for the payment of the annuities, beginning after the death of decedent, was a substitute for testamentary disposition, made in contemplation of death. In doing so the Board relied upon United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867.

■ In reviewing decisions of the Board, we are limited to a consideration of errors at law; the Board's findings may not be disturbed, if there is any substantial evidence to support them, and the review is limited to the question of whether the decision of the Board is arbitrary or erroneous as a matter of law. Elmhurst Cemetery Co. v. Com'r, 300 U.S. 37, 57 S. Ct. 324, 81 L.Ed. 491; Helvering v. Rankin, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed. 1343; General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154; Fish v. Helvering, 64 App. D.C. 166, 75 F.2d 769; Flannery v. Willcuts, 8 Cir., 25 F.2d 951; Washburn v. Commissioner, 8 Cir., 51 F.2d 949; Neal v. Commissioner, 8 Cir., 53 F.2d 806; Whitlow v. Commissioner, 8 Cir., 82 F.2d 569; Richards v. Commissioner, 9 Cir., 81 F. 2d 369, 106 A.L.R. 249; Updike v. Com'r, 8 Cir., 88 F.2d 807 (cert. denied 301 U.S. 708, 57 S.Ct. 942, 81 L.Ed. 1362); Flack v. Holtegel, 7 Cir., 93 F.2d 512.

■ The finding that the transfer was made in contemplation of death is a finding of fact. The phrase is used to describe the impelling motive of the donor and motive and intent are qualities of mentality that have their existence in fact. Mc-Caughn v. Real Estate Co., 297 U.S. 606, 608, 56 S.Ct. 604, 605, 80 L.Ed. 879.

■ Consequently the only question which we have any power to review is whether there was substantial evidence to support the ultimate finding that the tranfer was made in contemplation of death. As said in Flack v. Holtegel, 7 Cir., 93 F.2d 512, 514, "such conveyances are taxed because they are testamentary in character. Consequently the pertinent evidence is that which enlightens the court as to the motives of the grantor, usually, quite evidently, confined to the surrounding facts and circumstances. From these the court must determine the intent, the motive of the decedent. It is not necessary that there be a condition 'creating a reasonable fear that death is near at hand,' and that 'such reasonable fear or apprehension' must be 'the only cause of the transfer.' U. S. v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L. Ed. 867. But it is to be remembered that the dominant purpose is to reach 'substitutes for testamentary dispositions' and thus to prevent evasion of the estate tax. Nichols v. Coolidge, 274 U.S. 531, 541, 47 S.Ct. 710, 713, 71 L.Ed. 1184, 52 A.L. R. 1081; Milliken v. U. S., 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; U. S. v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. The transfer may have all the outward indicia of a completed gift inter vivos; hence the necessity of determining the motive of the transferor. The grantor must contemplate death, for such is the motive which leads to testamentary devices. The question is essentially one of the state of mind of the transferor."

This reasoning we felt imperative because of the language of the Supreme Court in United States v. Wells, supra, as follows (page 451): "It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford con-

vincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'"

Here the Board found that the decedent's contract with the University and his will, executed of even date, constituted a comprehensive and complete scheme for final distribution of his entire estate, putting his house in order against the time of his demise, making provision for those who were the natural objects of his bounty and disposing of all parts of his property, except the annuity reserved to himself during his lifetime; that his motive was testamentary in character and that, therefore, the transfer was made in contemplation of death. These findings, we believe, were justified by substantial evidence in the surrounding facts and circumstances appearing in the record. It is not for us to say that if we were passing upon the issue in a trial de novo we would come to the same or a different conclusion; rather it is our duty to recognize findings supported by substantial evidence. Here the facts and circumstances were such that men might differ in their conclusions as to the decedent's motive and in their conclusions of what was justified by the evidence. But the Board, having considered all of the facts and having weighed the same, did not make an arbitrary decision, void as a matter of law. The finding of fact, supported by substantial evidence, is binding upon us.

The decision is affirmed.