## BRADLEY et al. v. SMITH.
### No. 7113.

Circuit Court of Appeals, Seventh Circuit.

Aug. 12, 1940.

Val Nolan, U. S. Atty., of Indianapolis, Ind., for appellant.

Alan W. Boyd and James W. Noel, both of Indianapolis, Ind., for appellees.

Before MAJOR and KERNER, Circuit Judges, and WOODWARD, District Judge.

WOODWARD, District Judge.

The question presented by this record is whether or not a gift made by the decedent, Charles E. Coffin, to his daughter, Carolyn

Coffin Bradley, within two years of the death of the decedent, was made in contemplation of death within the meaning of Section 302(c) of the Revenue Act of 1926, as amended by Section 803 of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Code, § 811(c). The estate tax on this gift was paid under protest, a claim for refund was filed and denied and suit was instituted in the District Court by decedent's executors against the Collector of Internal Revenue to recover the amount of tax paid and interest thereon. The District Court made findings of fact and stated conclusions of law and held that the gift was not made in contemplation of death. It entered judgment in favor of the executors. The collector appealed.

Decedent died October 15, 1934, at the age of 85 years. The gift of $100,000 to his daughter Carolyn was made within a little more than four months prior to his death.

Decedent was a prominent citizen of Indianapolis, Indiana. He had been a member of the park board for more than twenty years and of the board of public works from 1917 to 1921. He was very active and was engaged in large business affairs. He had been president and general manager of the Central Trust Company for a number of years prior to 1913. In that year the trust company was consolidated with the Farmers Trust Company and decedent remained a director and chairman of the board of the new company until 1929. During all of his life and up until his death he had large private business interests and owned properties which he managed. His fortune had been built up through his own efforts. From 1911 until the time of his death he was one of the directors and the treasurer of the Star Publishing Company, a corporation engaged in the publication of a number of newspapers, including the Indianapolis Star. As such treasurer he had charge of the important expenditures and investments of the Star Publishing Company. He was active as such treasurer and performed the duties of his office until July 8, 1934, excepting during times of illness hereinafter referred to and at times of his vacations. He was the personal representative of John C. Shaffer, hereinafter referred to more particularly, who owned practically all of the common stock of the corporation. He was active in many civic organizations and for many years and up to the time of his death was president of the Board of Trustees of the Meridian Street M. E. Church.

He was intensely interested in the game of whist, had written two separate books on the game and had attended national contests in different parts of the country.

Until August, 1926, decedent was at all times in good health and in regular attendance upon his various businesses, when he suffered an acute uremic attack from which he completely recovered within three or four days. On April 6, 1927, he consulted a doctor concerning a heart ailment. The doctor prescribed rest but no medicine. He visited the doctor from time to time until October 10, 1927, when he appeared to have recovered completely. On May 15, 1929, he underwent an operation for an enlarged prostate gland. Before the operation he had consulted specialists in genito-urinal surgery who recommended the operation. The heart specialist observed him after the operation and found no cause for alarm on account of decedent's heart. The prostate operation resulted in a general improvement of decedent's health. In May, 1932, he had a gastro-intestinal attack for two days, with no heart symptoms, from which he fully recovered. He did not consult a heart specialist again until December, 1933, when he had a recurrence of his former trouble. He had a complete recovery but upon the advice of his physician he went to Florida in January, 1934, and remained there until March, 1934, when he had a recurrence of the trouble that occurred in December, but he came home apparently recovered entirely. He had no further attendance by any physician until July 8, 1934.

From June 21 to June 27, 1934, he attended the session of the American Whist Congress in Chicago and won a prize. He was in apparent good health on July 4, 1934, when he attended an annual party at his daughter's home in Culver. He returned to Indianapolis after July 4th and on July 8th was stricken with what turned out to be the beginning of his last illness, the illness commencing after an attack of indigestion. From that time on he was under the supervision of a physician, but rallied from time to time and left the house for drives and attended to his business as treasurer of the Star Publishing Company until late in August, 1934. From that time on he did not leave the house and died October 15, 1934. His physician stated that de-

cedent was always active, that after the beginning of his last illness he was always anxious to get back to his work. The physician had difficulty in keeping him confined sufficiently. There seemed to be no signs of fear of death until the last two or three weeks of his life.

On February 26, 1918, decedent's family consisted of himself, his wife Mary H. Coffin, and his daughter Carolyn Coffin, a son Clarence Coffin, by a former wife, and a step-daughter Jean Fletcher Ingram. Prior to February 26, 1918 he had advanced more than $40,000 to his son Clarence. At no time prior to June 5, 1934, had he made any advances to his daughter Carolyn.

On February 26, 1918, the decedent, Coffin, entered into a contract with John C. Shaffer whereby Shaffer sold and transferred to decedent 500 shares of the common stock of the Star Publishing Company of Indianapolis, Indiana, for the purchase price of $100,000, which was paid by decedent. By the same contract Shaffer was given the option to repurchase the stock for the same price. Certificates of stock were issued and delivered to decedent. Decedent, on February 26, 1918, in his own handwriting, made an endorsement on the contract to the effect that the contract and stock were assigned and transferred to Mary H. Coffin, his wife, and Carolyn Coffin, his daughter. About a month after the date of the contract he exhibited the contract and its endorsement to his regular attorney. He stated to his attorney that he had had some personal advantage from the personal estate of his wife and that when Shaffer should exercise the option and re-purchase the stock, decedent intended to give the proceeds to his wife and daughter. At the same time he stated to his attorney that he had provided and advanced money to Clarence Coffin, a son by a former wife, in amounts aggregating $40,000 in an attempt to establish him in business. He instructed his attorney that if he should die without having perfected the gift to his wife and daughter he desired his attorney to see that the gift was perfected, disclosing the particular place in his safe in which the instrument was kept.

Between February 26, 1918, and June 5, 1922, decedent's daughter Carolyn had been married to Charles Harvey Bradley and was thereafter known as Carolyn Coffin Bradley.

On June 5, 1922 the first certificate of stock was exchanged and a new certificate issued. The original endorsement on the contract was scratched out and a new endorsement, in the handwriting of the decedent, was made on the contract, referring to the re-issued certificate, and stating in effect that the contract was assigned to Mary H. Coffin and Carolyn Coffin Bradley. Again decedent advised his attorney of what had been done and again stated to his attorney that the money should be paid to his wife and daughter immediately on the re-purchase of the stock by Shaffer.

His wife, Mary H. Coffin, died March 8, 1933.

On May 11, 1933, decedent called on his attorney and advised his attorney that Shaffer had not yet exercised his option, that during the lifetime of his wife he had never delivered the contract or assignments to his wife and that she had no knowledge of the assignments. He further advised his attorney that in view of the death of his wife he desired to assign the contract and the stock to his daughter so as to make her a present on her thirty-fourth birthday, which was May 11, 1933. His attorney then prepared and decedent executed, on May 11, 1933, an instrument in which he assigned and presented to his daughter Carolyn "on her thirty-fourth birthday, all of my right, title and interest in and to said contract with said Shaffer dated February 26, 1918 and in and to the said certificate of stock of the Star Publishing Company."

At the time this assignment was executed, decedent informed his attorney that he thought Shaffer was getting ready to re-purchase the stock, but was not sure. A duplicate of the assignment was sent to Shaffer and was retained by Shaffer until about June 5, 1934.

On June 4, 1934, Shaffer notified decedent that he would pay the money and re-purchase the stock on June 5, 1934. On that day, and before Shaffer paid the money, decedent called his daughter and Charles Harvey Bradley, her husband, decedent's attorney and the representative of Shaffer to his office. At that meeting decedent exhibited to his daughter Carolyn the instrument of February 26, 1918, together with the former assignments, of none of which did his daughter have knowledge prior to that time. At that meeting decedent told those present that he was going to carry out a plan that he had

had in mind for a long time and would pay the amount of $100,000 to his daughter. Before doing so, however, he presented to his daughter and exhibited to those present, a document which he had prepared by himself providing for the retention of income thereon during his lifetime and making other provisions. His attorney thereupon advised him that if he intended to make the gift in accordance with the assignment of May 11, 1933, the gift must be complete and irrevocable and should have no strings to it. The document, however, was never executed.

On June 5, 1934, Shaffer paid the decedent $101,100 in full payment and settlement of the loan represented by the agreement of February 26, 1918, in two checks, one for $100,000 and one for $1,100. The check for $100,000 was endorsed by decedent and delivered to his daughter Carolyn, who thereupon executed a release to Shaffer. The proceeds of the other check were retained by decedent.

Such are the circumstances surrounding the gift to his daughter Carolyn, which the Collector maintains was made in contemplation of death within the meaning of the statute. Decedent's estate, including the gift, amounted approximately to $250,000.

The Court found that neither the endorsements of February 26, 1918, of June 5, 1922, nor the assignment of May 11, 1933, nor the transaction of June 5, 1934, were made by decedent in contemplation or expectation of death; but that the payment that was made to his daughter Carolyn on June 5, 1934, was made pursuant to a plan and design formed by him more than sixteen and a half years before the making of the gift.

■ The meaning of the phrase "contemplation of death" is no longer open to doubt or uncertainty. In United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 451, 75 L.Ed. 867, the court said that the dominant purpose of the statute was "to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax * * * as the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor · must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition."

The dominant purpose of the statute is to reach "substitutes for testamentary dispositions" and to prevent evasion of the estate tax. Nichols v. Coolidge, 274 U.S. 531, 541, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; United States v. Wells, supra; Purvin v. Commissioner, 7 Cir., 96 F.2d 929, 931, 120 A.L.R. 166.

■ From the evidence the court "must determine the intent, the motive of the decedent." Purvin v. Commissioner, supra. Was the intent, the motive, one associated · with life or was it one associated with a testamentary disposition of decedent's property?

■ Whether or not a transfer was made in contemplation of death is a question of fact deducible from all the evidence. The trial court held that the impelling motive of the transfer was associated with life. Can a life motive be reasonably inferred from the evidence?

■ It appears from the uncontradicted evidence that on February 26, 1918, sixteen and one-half years before his death, the decedent formed a plan or design to give the amount of the Shaffer loan, when paid, to his wife and daughter. While the gift was consummated when Shaffer paid the loan on June 5, 1934, yet the motive for the gift antedates its consummation by several years. The design or plan originated on February 26, 1918. It was reaffirmed after the marriage of his daughter, Carolyn, to Charles Harvey Bradley, when decedent scratched out the original endorsement and inserted the name of his daughter in a new assignment of June 5, 1922. After the death of decedent's wife he again affirmed the original design or plan when, on May 11, 1933, he instructed his attorney to prepare, and when he executed, an assignment to his daughter Carolyn for presentation to her on her thirty-fourth birthday of all his right and interest in the Shaffer contract and the certificates of stock. The design was accomplished immediately upon the repurchase of the stock by Shaffer and the payment by Shaffer to decedent of the sum of $100,000.

Decedent was twice married. By his first wife he had a son, Clarence, to whom he had given financial assistance to the extent of $40,000. His son apparently was not successful and had an unfriendly atti-

tude toward his father. Carolyn was a daughter by his last wife. In 1918 when he formed the intention of making the gift he stated that he had had some advantage from the management of the estate of his wife. He had a moral obligation which ran to his wife and daughter and, after the death of his wife, to his daughter to make some kind of restitution or compensation for the benefits he had received. Actuated by a normal sense of justice he was motivated also to balance up the heavy gifts he had made to his son by a former wife. He had discharged a moral obligation to his son. He had made no substantial gift to Carolyn. His gift to her was prompted by a sense of justice. The motive for the gift was associated with life. It lacks the elements of a testamentary disposition. United States v. Wells, supra.

The plan or design was conceived when he was in good health and when there could not have been any premonition of death. There is no evidence showing that he was under any apprehension of death when he executed the last assignment to his daughter in 1933. After the gift was consummated in 1934 he attended the American Whist Congress in Chicago, was awarded a prize, was entertained in Chicago and returned to Indianapolis in apparent good health. He continued to attend his business at the Publishing Company as treasurer until late in August, 1934.

We are of opinion that the record contains substantial evidence from which the trial court might conclude that the rebuttable presumption created by the statute was overcome and that the gift was not made in contemplation of death.

Under Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, we must affirm unless the finding of the trial court is "clearly erroneous." The trial court had evidence before it from which it could reasonably infer that the transfer was not made in contemplation of death. We cannot say that the conclusion of the trial court was "clearly erroneous", and hence the judgment of the trial court is affirmed.

KERNER, Circuit Judge (dissenting).

I do not concur in the holding of the foregoing opinion. The ultimate fact to be determined is whether the transfer of the $100,000 was a transfer in contemplation of death within the meaning of Sec. 302(c) of the Revenue Act of 1926, as amended by Sec. 803(a) of the Revenue Act of 1932, c. 209, 47 Stat. 169, 279. No direct proof that the transfer was not in contemplation of death was offered, and if shown at all it was by way of inference from certain circumstantial evidence.

The dominant aim of the statute is to reach substitutes for testamentary dispositions and a transfer is in contemplation of death if the impelling motive for the transfer leads to testamentary disposition. United States v. Wells, 283 U.S. 102, 51 S. Ct. 446, 75 L.Ed. 867.

If the transfer is of a material part of the decedent's property without consideration and made within two years prior to his death, the statute provides it shall be deemed to have been made in contemplation of death. The burden of rebutting this presumption under the facts in our case was upon the plaintiff.

The decedent at the time of the transfer was eighty-five years of age. Within six months before the transfer he suffered two heart attacks, the latter attacks occurring within three months of the transfer, and a little more than a month later he had a third attack which definitely foreshadowed his death. When he gave the check to his daughter, he remarked that he was doing something he long had had in mind and then he handed her an agreement for her to sign, requiring that the money be invested in a certain manner with the income payable to the decedent and with the privilege of invading the principal.

It has been held that the burden is not met if a motive is disclosed which is as consistent with a testamentary disposition of property as with a gift inter vivos; or if two motives are disclosed, either of which might have accounted for the transfer, the one testamentary and the other not. Farmers' Loan & Trust Co. v. Bowers, 2 Cir., 68 F.2d 916, Id., 2 Cir., 98 F.2d 794.

My examination of the record impels me to the conclusion that there is no substantial evidence from which any life motive may be inferred; on the contrary, it is clear that the decedent was contemplating death and that he was making the gift as a substitute for a testamentary disposition.