**FLANNERY v. WILLCUTS, Collector of Internal Revenue.**

Circuit Court of Appeals, Eighth Circuit.
April 18, 1928.

No. 7966.

1. **Courts** ⊜406(1¼)—**Circuit Court of Appeals will not weigh conflicting evidence, but may search record for substantial evidence supporting lower court's finding.**

The Circuit Court of Appeals will not weigh the evidence, if in disagreement, to find on which side it preponderates, but may search the record to find whether there is any substantial evidence to support lower court's finding of fact.

2. **Internal revenue** ⊜8(11)—**Thought of death, arising from known infirmity believed likely to cause death, must be actuating motive to hold gift made in "contemplation of death" (Revenue Act 1918, § 402(c); Comp. St. § 6336¾c(c).**

To hold that gift was made in "contemplation of death," within Revenue Act 1918, § 402 (c), 40 Stat. 1097 (Comp. St. § 6336¾c(c), the thought of death, not as anticipation of the inevitable, but arising because of some known infirmity believed likely to cause death, must be actuating motive, without which gift would not have been made.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contemplation of Death.]

3. **Internal revenue** ⊜8(11)—**Gifts inter vivos are not taxable, unless testamentary in purpose (Revenue Act 1918, § 402 (c); Comp. St. § 6336¾c(c).**

Gifts inter vivos are not taxable, under Revenue Act 1918, § 402 (c), 40 Stat. 1097 (Comp. St. § 6336¾c(c), unless they are testamentary in purpose.

4. **Internal revenue** ⊜38(12)—**Presumption that taxing officials acted solely on statutory presumption that gift was made in contemplation of death must give way, if inconsistent with facts (Revenue Act 1918, § 402 (c); Comp. St. § 6336¾c(c).**

Presumption that taxing officials acted solely in reliance on presumption, raised by Revenue Act 1918, § 402 (c), 40 Stat. 1097 (Comp. St. § 6336¾c(c), that gift within two years before donor's death was made in contemplation of death, must give way, if inconsistent with facts.

5. **Internal revenue** ⊜38(12)—**Evidence held to show that gifts within two years before donor's death were not made in contemplation of death (Revenue Act 1918, § 402(c); Comp. St. § 6336¾c(c).**

In action to recover tax paid on gifts made by decedent within two years before her death, evidence *held* to show that none of such gifts were made in contemplation of death within Revenue Act 1918, § 402 (c), 40 Stat. 1097 (Comp. St. § 6336¾c(c).

6. **Internal revenue** ⊜2(16)—**Repealing act held to save estate tax which had not accrued under act repealed (Revenue Act 1918 [40 Stat. 1057]; Revenue Act 1921 [42 Stat. 227]).**

Estate tax, which had not accrued under Revenue Act 1918 (40 Stat. 1057), as well as taxes accrued thereunder at time of its repeal by Revenue Act 1921 (42 Stat. 227), was saved by latter act.

In Error to the District Court of the United States for the District of Minnesota; Joseph W. Molyneaux, Judge.

Action by George P. Flannery, administrator of the estate of Mary T. Hill, deceased, against Levi M. Willcuts, Collector

of Internal Revenue for the District of Minnesota. Judgment for defendant, and plaintiff brings error. Reversed in part.

George W. Morgan, of St. Paul, Minn. (Davis, Severance & Morgan and Cleon Headley, all of St. Paul, Minn., on the brief), for plaintiff in error.

Lafayette French, Jr., U. S. Atty., of St. Paul, Minn., and C. M. Charest, General Counsel Bureau of Internal Revenue, and T. H. Lewis, Jr., Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant in error.

Before WALTER H. SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

LEWIS, Circuit Judge. Mary T. Hill died intestate November 22, 1921, aged 75 years, 4 months and 21 days; and the principal question in this case is whether certain gifts made by her were a part of her estate under the Revenue Act of 1918 (40 Stat. 1057), subject to the federal estate tax. She was the widow of James J. Hill, who died intestate May 29, 1916, leaving a large fortune in which her distributive share amounted in value to more than $16,000,000. The administrator of her husband's estate in settlement with her gave her about $1,000,000 in cash, and for the remainder of her share, almost all of it consisted of stock in banks and trust companies, stock in railroad companies and other corporations, mortgage bonds of railroad and other corporations, United States bonds and bonds of foreign countries. From these she made the gifts in question and left at her death an estate of more than $10,000,000, on which her administrator paid an estate tax of $2,011,060.96. The tax officials thereafter claimed a deficiency in the amount of the taxable estate and required her administrator to pay an additional sum of more than $1,000,000 on the gifts here in question as a part of her estate, which he did under protest. Her administrator then brought this action to recover the additional sum paid. Trial by jury was waived. Without discussing the issues, or stating the reasons for his conclusions, the District Judge made general findings of fact, among them:

"That the transfers, gifts and trusts set forth in the complaint * * * were and each of them was made and created by the decedent Mary T. Hill in contemplation of her death within the meaning of section 402 (c) of the Revenue Act of 1918 [Comp. St. § 6336¾c(c)]."

Recovery was therefore denied.

That part of section 402 of the Act of 1918 to which the court referred in its finding reads thus:

"That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\*    \*    \*    \*    \*    \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title." 40 Stat. 1057, 1097.

The gifts, except one, were made in the form of trusts, and are referred to as (1) trusts for decedent's thirteen grandchildren; (2) trust for decedent's nine children; (3) trusts for other relatives, friends and employés; and (4) the gift of a diamond necklace valued at $18,000 to one of decedent's daughters, made on July 8, 1920. The written declarations of trust specified the property transferred for each donee to a named trustee. They were absolute in form, gifts inter vivos, no interest or future control being retained by the donor; and immediately after the declarations were executed they and the property specified for each donee were delivered to and received by the trustee who accepted the trust. The trust for twelve of the grandchildren was executed on November 25, 1919, and a separate trust for the remaining grandchild was executed on October 19, 1920. For each of eleven of her grandchildren Mrs. Hill conveyed to the named trustee in trust 546 shares of the capital stock of the First National Bank of St. Paul, Minn., 144 shares of the capital stock of the Northwestern Trust Company of St. Paul, Minn., and $77,000 in cash, and for the other grandchild exactly half that number of shares and cash. For the thirteenth grandchild she established a trust estate consisting of $100,000 par value Great Northern Railway mortgage bonds. The powers of the trustee in handling the trust estates are set forth. Compensation for the

services of the trustee were provided for out of the income and there were restrictions as to payment of income to the beneficiaries, one-half the net income until each beneficiary reached the age of thirty years, thereafter all of it, and at the age of forty years the whole estate to be delivered to the beneficiary. There was disposition of the trust estate in case of death before that time.

The declaration of trust for her nine children was executed July 19, 1920. That instrument transferred to the trustee for each child $21,000 par value United Kingdom of Great Britain and Ireland and the French Republic Joint Five Per Cent. Bonds, 33 shares of the capital stock in St. Paul Cattle Loan Company and a named number of shares in different banks and trust companies doing business in New York City, Chicago, St. Louis, Minneapolis and St. Paul. Each child was to receive, during his or her life, the net annual income of the trust estate and there was disposition of the corpus of the trust estate upon the death of each child. The powers of the trustee were expressed and a limitation put on compensation for its services. There were three separate declarations of trust covering donations to a sister, friends and employés, in which Great Northern Railway mortgage bonds constituted the gifts, the largest one being $100,000 face value of said bonds given in trust for decedent's sister. The others for the different donees were each not more than $10,000 nor less than $1,000 of such bonds. These last three declarations were all executed by the donor on November 24, 1919.

[1-3] It will be noticed that the trust for twelve of the grandchildren and the three trusts for a sister, friends and employés were executed scarcely within the two years preceding Mrs. Hill's death. The one for the other grandchild and the one for the nine children were executed more than one year, but less than two before the date of her decease. At the trial defendant stood on the presumption raised by the statute quoted supra, and plaintiff took the burden of showing that the gifts were not made in contemplation of death. We, of course, agree with counsel for defendant in error, that this court will not weigh the evidence, if it is in disagreement, to find on which side it preponderates, but we may search "the record to find whether there is any substantial evidence to support the lower court's finding that as a matter of fact these gifts were made in contemplation of death." If there is no such evidence the court erred in law. We are also in accord with counsel's statement in his brief

that the cases "hold that the thought of death must be the actuating motive without which the gift would not have been made"—adding thereto the qualification that the "thought of death" as an anticipation of the inevitable which we all realize, is not within the statute; but to be within the statute the thought must arise because of some known infirmity which, it is believed, will likely cause death. We agree with Judge Morton that gifts inter vivos are not taxable under this statute, unless it can be said on the facts of the case they are testamentary in purpose. Bradley v. Nichols (D. C.) 13 F.(2d) 857.

[4] It seems reasonable to suppose that the taxing officials also acted solely in reliance on the statutory presumption; but if that presumption is inconsistent with the facts in the case it must give way. It will have served its purpose,—in effect, so declared by the statute. In Fresh v. Gilson, 16 Pet. 327, 331, 10 L. Ed. 982, it is said:

"But presumptions can stand only whilst they are compatible with the conduct of those to whom it may be sought to apply them; and still more must give place, when in conflict with clear, distinct and convincing proof."

Wigmore on Evidence (2d Ed.) § 2491 says:

"Nevertheless, it must be kept in mind that the peculiar effect of a presumption of law (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule."

In Mobile, J. & K. C. Railroad Co. v. Turnipseed, 219 U. S. 35, 31 S. Ct. 136, 55 L. Ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463, a State statute which raised a presumption of negligence where damages were inflicted by the running of locomotives or cars was under consideration. The court (page 43 [31 S. Ct. 138]) said:

"The only legal effect of this inference [of negligence] is to cast upon the railroad company the duty of producing some evidence to the contrary. When that is done the inference is at an end, and the question of negligence is one for the jury upon all of the evidence."

[5] We summarize the uncontradicted facts adduced at the trial: Mrs. Hill spent the winter of 1918–19 at the Hill winter home in Georgia, stopped for a while in New York City at an apartment which she had held un-

der lease for several years and which she had furnished, and returned to St. Paul in April or early May, 1919. The furnishings in the New York apartment were hers, she kept two maids there, she had an automobile and a chauffeur there and owned the garage. Her lease on the apartment expired October 1, 1920, and on its expiration she renewed it for three years. When she returned to St. Paul in the spring of 1919 she at once took up the subject of establishing trusts for her children and grandchildren. She first discussed the matter with Mr. Toomey, her business manager at St. Paul. Mr. Toomey had been in the employ of Mr. Hill for many years. He was entirely familiar with Mr. Hill's interests and had rendered services in looking after his property. After Mr. Hill's death he acted in that capacity for Mrs. Hill. A rough draft was at once drawn up expressing Mrs. Hill's wishes in the matter. Her first idea was to make one declaration of trust, describing therein the property to be given and held in trust for each child and each grandchild separately. Mr. William D. Mitchell, then an attorney at St. Paul, now Solicitor General, was then employed by Mrs. Hill some time in May, 1919, to put the declaration in proper form. Her consultations with Mr. Mitchell resulted in a decision to make two declarations of trust, one for the children and one for the grandchildren. Mr. Mitchell made several drafts to meet Mrs. Hill's wishes. She finally concluded to make one trust for twelve of the grandchildren and another for the other grandchild. Before the fall of 1919 came on she had fully settled, in consultation with Mr. Mitchell, the grandchildren's trusts; and also the trust for her nine children, except the disposition to be made of the remainder estate in the property that she was to put in trust for them. They were to have only a life interest, receiving the net income. Mr. Mitchell left St. Paul on his vacation some time during the summer and did not return until the fall. Also Mrs. Hill early in July went to North Oaks Farm, some twelve miles out of St. Paul, and remained there until October or early November. North Oaks Farm had been maintained by Mr. Hill and was a part of his estate. It consisted of approximately 4,000 acres, about 1,000 of which was in cultivation. Mrs. Hill while there during the summer of 1919 became interested in the comfort of the help employed and decided to build better quarters for them and make other improvements on the place. She personally selected the site for the new building, selected a contractor, sent for an architect and gave personal attention to these improvements, made at a total cost of about $60,000. While she was there some one of her children in St. Paul, without her knowledge or wish, sent Dr. Gilfillan, who had been her physician, out from St. Paul to see her. She did not know the doctor was coming. She said she did not know why he had been sent out, she did not need his services. That was the last call made by Dr. Gilfillan. Later when she needed a physician she sent for Dr. Hoff. Dr. Gilfillan testified that when he examined Mrs. Hill at North Oaks Farm in the fall of 1919 he found high blood pressure, muscular trouble with the heart and kidney trouble, but he did not tell her about her condition in that respect and she did not ask him about it. He testified that he had been her physician prior to that time, that he never saw her worried over herself or over her condition, that she was of good spirits and of a very equable disposition and not nervous in any way, that she never indicated that she anticipated death in the near future and never talked to him about it. He said she tended to be overactive and he told her not to go upstairs and to be careful about any physical exertion, never to do anything in a hurry.

When Mr. Mitchell and Mrs. Hill had both returned to St. Paul in the fall of 1919 the execution of the grandchildren's and children's trusts was again taken up. Mrs. Hill again expressed some uncertainty about the dispositions to be made of the nine remainder estates in the children's trust, but the trust for the twelve grandchildren was prepared by Mr. Mitchell in accord with her instructions, and on November 25, 1919, she executed that declaration and, as has been said, it and the securities and cash therein named for each grandchild were at once delivered to the trustees and they accepted. Mrs. Hill was in bed at that time. She was taken ill about November 12, 1919, and Dr. Hoff was called. She remained in bed or in her room until about the middle of December, 1919, when she became seriously ill. She began to improve early in January following and was able to leave her room within a few weeks thereafter and to go out as soon as the weather permitted. Her recovery appears to have been gradual and complete. A trained nurse who was first called into the home at the time of Mr. Hill's last sickness remained with Mrs. Hill as a sort of companion and servant, and she testified that she regarded Mrs. Hill as something of an invalid, after her illness that has just been referred to, until her death; but the testimony of many other witnesses, neighbors and friends, and members of her family, indicates that the testimony of the

nurse as to Mrs. Hill's condition after that sickness was rather exaggerated. Throughout the remainder of 1920 and 1921 up until her last illness, while not so active as she had been previous to November, 1919, she went about, took automobile rides, was as interested as theretofore in her household affairs, read the papers, was interested in public affairs, read good literature, visited with her friends, and was as cheerful as she had been theretofore. She is described as having a very placid, calm disposition and an alert mind, never depressed and at all times in possession of all her faculties. She was industrious and returned to her habit of sewing and knitting. Early in January, 1920, her business manager took up important matters with her and she was able to consider with him business transactions from that time on until her last sickness, which came on in October, 1921, from which she died on November 22, 1921.

The testimony of neighbors, relatives and friends as to Mrs. Hill's physical and mental condition, her activity, her uniform cheerfulness and her daily interest in affairs during a period of more than two years prior to her death is too lengthy to be reviewed. It all tends to establish that her mind was free from thoughts of death, except on or about December 19, 1919, when she was seriously ill and made gifts causa mortis to some of her children and grandchildren, which she subsequently expressly revoked, and had a will prepared which she never executed. As has been said, she seemed to fully recover from that illness and thereafter her health was as good and she was as active physically and as alert mentally as might be expected from one of her age, with no suggestion from her, nor conduct on her part, indicating that she was in contemplation of death.

On April 1, 1921, she appointed new trustees for six of her grandchildren under the trust which she had executed for them on November 25, 1919, the trustees named in the original declaration having resigned as to those beneficiaries. She had reserved the power in that declaration to fill any vacancy that might occur during her life. In that instrument of appointment of April 1, 1921, we find this statement over her signature:

"Being advised that, as said trust deed was executed by me while suffering from a severe illness, the said trusts were of the nature of gifts causa mortis and subject to revocation on my recovery, and, having fully reconsidered the same, I do hereby in all things confirm the said trusts, except," followed by a paragraph giving the new trustees for the six named grandchildren power to withhold from said six beneficiaries the net income or a part thereof that was to be paid to them under the original declaration and add it to the principal of the trust estate, or at any time thereafter release it to said beneficiaries. Some reliance is placed on the above excerpt to support the contention that the grandchildren's trust was in its nature testamentary. It will be noticed that Mrs. Hill did not say that these gifts were made causa mortis. Moreover, at that time Mrs. Hill had recovered from her illness of December 19, 1919, and was going about, taking automobile rides and calling at Mr. Toomey's office on business matters, and she says in the excerpt that she confirms the grandchildren's trust in all things except the modification which she then attempted to make as to the distribution of income to six of the beneficiaries. Mr. Mitchell drew that document and his testimony explains fully how it came to be made. Perhaps no one was better informed as to Mrs. Hill's intentions and purposes in making these gifts and her status of mind when she decided to do so than Mr. Mitchell. We therefore quote the substance of all of his testimony. He said:

"During the years 1919, 1920 and 1921 and for some time prior thereto, I acted as attorney for Mrs. Mary T. Hill of St. Paul, widow of the late James J. Hill. In that capacity I drafted, as her attorney, all of the indentures of trust or trust agreements executed by her during and after the year 1919, including the so-called grandchildren's trust, executed November 25, 1919, and the so-called children's trust, signed July 19, 1920. * * * the records and accounts of this office (his law office) show that commencing May 19 and for a period of several days thereafter, I gave my entire time and attention to drafting the children's and grandchildren's trusts. From these facts I am able to say with certainty that the plan to create these trusts was conceived by Mrs. Hill prior to May 19, 1919, many months before her first serious illness. The first draft, made on May 19, 1919, covered both the children's and grandchildren's trusts, all of those being included in one document. It became evident later that more rapid progress could be made if these two proposals were treated separately as Mrs. Hill was undecided in the summer of 1919 as to the disposition to be made of certain remainder interests under the children's trust, and, as she had definitely made up her mind during the summer of 1919 with respect to the provisions of the grandchildren's trust, the instrument relating to the grandchildren's

trust was finally drafted and prepared for signature without waiting her decision with respect to the matters involved in the children's trust. Mrs. Hill, after examining the preliminary draft of the grandchildren's trust and certain revisions thereof which I prepared under her instructions during the summer of 1919, reached a final decision in the late summer of 1919 respecting all its provisions. The reason that the grandchildren's trust was not actually signed prior to November 25, 1919, was because in the late summer and early fall I was away on a vacation and was not here to complete the final draft until October or November. Mrs. Hill's decision as to the making of the grandchildren's trust and as to all the terms and provisions thereof and her final instructions with respect thereto were made and given more than two years prior to her death and prior to the inception of her first serious illness. The children's trust was not planned or conceived by her while ill or as a result of illness, but long prior to her first serious illness and was merely interrupted by the first serious illness. In the spring of 1920, after her first serious illness, she again took up the matter of the children's trust and reached a decision as to all its provisions, and the same was executed in July of that year. In all my dealings with Mrs. Hill prior to her first serious illness in the early winter of 1919, nothing she said or did indicated that she was in apprehension of death or making these children's and grandchildren's trusts in contemplation of death, or that she had any apprehension of her decease occurring at an early date or within the period of expectancy of a woman of her age. On the contrary, during the period in 1920 and 1921 after her first illness and before her final and fatal illness, she was singularly free from any apprehension of this kind.

"With respect to the document signed by her April 1, 1921, attempting to amend the grandchildren's trust so as to authorize the trustees to withhold income from the beneficiaries in their discretion, the facts are as follows: As soon as the grandchildren's trusts were signed in November, 1919, copies were furnished to the parents of the grandchildren. Shortly thereafter and in the spring of 1920, Mr. John J. Toomey, Mrs. Hill's agent and business manager, informed me that two of Mrs. Hill's daughters had objected to the provisions of the trusts on the ground that they gave their children an independent income at an early age and freed them from parental control, and that they had expressed these objections to Mrs. Hill and

that Mrs. Hill was disturbed and unhappy because they were not satisfied with the trusts and wanted to know if the trusts could not be changed to suit her daughters' ideas in this respect. I advised Mrs. Hill through Mr. Toomey at that time that no power of revocation was contained in these grandchildren's trusts and that Mrs. Hill had no power to change them without the consent of the beneficiaries, who were minors and could not consent to changes. Two or three times thereafter during 1920 and the early part of 1921, Mr. Toomey again brought up this subject, and said that two of Mrs. Hill's daughters were still criticizing the trusts and expressing their criticisms to Mrs. Mary T. Hill, who continued to be disturbed and uncomfortable about the situation, and Mr. Toomey kept urging me to suggest some way that the matter could be fixed up so as to relieve Mrs. Hill's mind on the subject, and finally in the early part of 1921 I told Mr. Toomey that he might have Mrs. Hill sign an amendment to the trusts, changing the provisions respecting distribution of income, coupled with a recital that the trust was executed causa mortis. I told Mr. Toomey at the time that this amendment was made that it was my opinion the amendment was not legally effective because in truth and in fact, although Mrs. Hill was slightly ill at the time the grandchildren's trust was actually signed, it had been planned and decided upon before that and was not, in my opinion, intended by her to be revocable in case she recovered from the illness from which she was suffering when the document was signed. I also told Mr. Toomey that if the amendment was executed in this way, it would probably be effective as the beneficiaries, when they became of age, were not likely to contest the validity of the amendment, and so this method of handling the situation was suggested to Mrs. Hill as a way out of the difficulty and in order to satisfy the criticisms made by her daughters. * * * That the children's trust was not planned or conceived by decedent while ill or as the result of illness, but long prior to her first illness, and was merely interrupted by the first illness, so-called; that in the spring of 1920, after her first serious illness, she again took up the matter of the children's trust and reached a decision as to all its provisions, and the same was executed on or about July 19, 1920; that the children's trust, as originally discussed and drawn, was substantially the same in terms as the children's trust finally so executed, and that the only substantial difference therein was in the disposition of certain remainder interests after the termination of the

life estates therein set forth; that in all of his dealings with decedent, nothing she said or did indicated that she made said children's trust or grandchildren's trusts in contemplation of death or that she had any apprehension of her decease occurring at an early date, or within or prior to the period of expectancy of a woman of her age, but, on the contrary, during the period in 1920 and 1921, after her first illness and before her final and fatal illness, she was singularly free from any apprehension of this kind. * * *

"In all my dealings with Mrs. Hill on the subject of these trusts she never by word or deed disclosed any desire or intention that the possession or enjoyment of the trust estates by the respective donees should be in any way dependent or conditioned upon her death, nor did she in any way disclose any purpose or intention to ,so draw the trust instruments that the possession or enjoyment of the trust property by the donees would be deferred until after her death. In the case of the grandchildren's trusts the provisions deferring the enjoyment of the income, or a portion of it, and of the principal of the trust estates until the grandchildren attain the ages specified, were devised solely in the interests of the grandchildren and with a view to giving them the use and enjoyment of the property at ages at which·they were competent to receive and use it in a proper manner and at ages when they would probably find it useful. Never in my conversations or dealings with Mrs. Hill about these trusts was the question whether the beneficiaries would have the enjoyment of the property before·or after her death mentioned or discussed, and never in any of such conversations ·or dealings did Mrs. Hill ever discuss or mention the question whether the property covered by these trusts or any other of the trusts would or would not be subject to estate or inheritance taxes, and in none of my conversations or correspondence with her did I ever raise the tax question or suggest or mention the problem whether by making these trusts she should or could relieve her estate from any transfer, inheritance or estate taxes, and I am very sure from my dealings with Mrs. Hill and knowledge of her intentions and character that neither of these trusts was devised or executed with any thought on her part of relieving her estate from any taxes; I am sure she did not have that problem in her mind and in planning these trusts had no thought of the operation of the tax laws, and her whole aim and purpose in the making of these two trusts was to make during her lifetime gifts to her children and grandchildren which would insure them a moderate income during their lives, and the possession and enjoyment of which would take effect in them at times and under conditions which would serve their best interests, without regard to whether she were living or dead."

We have noted that the greater part of the property placed in trust for twelve ‿of the grandchildren, and substantially all for the nine children, consisted of stock in banks that had come to Mrs. Hill from her husband's estate. Shortly after receiving her share she expressed a wish not to continue to hold these stocks. She thought she could not assume the burden of looking after them, and repeatedly said that Mr. Hill had told her bank stocks were not a good investment for a woman. At the time of Mr. Hill's death the only property she owned was the family home, its furnishings, some valuable jewels and 29 shares in the Great Northern Railway Company. She had had no´ experience in or liking for business affairs.

Without further review of the facts it is· our opinion that a reasonable and fair estimate of all the proof leaves no other rational conclusion than that none of the gifts under consideration were made in contemplation of death; that the ones made to the children and grandchildren had been determined upon by Mrs. Hill and formulated in general terms as early as in the spring of 1919, at a time when she had no thought of the approach of death; nor under the proof did she contemplate death when she executed any of the declarations of trust in 1919 and 1920. The three lesser trusts constituting gifts to other relatives, friends and employés are all of small amounts, excepting one of $100,000 to a ´sister, the remainder are from $1,000 to $10,000 each, making a total of $60,000. They and the necklace which she gave ‵to one of her daughters on July 8, 1920, of a stated value of $18,000, seem to be immaterial parts of her estate and thus are excluded from her taxable estate by the statute in terms.

The finding of the court quoted supra was without any basis in fact on the proof adduced to support it and contrary to the undisputed proof, and was therefore error in law. [6] The plaintiff also sued to| recover the $2,011,060.96 that was paid by the administrator as an estate tax on more than $10,500,-000 in value of property which Mrs. Hill owned and possessed at the time of her death. As to that it is argued that no estate tax had *accrued* upon Mrs. Hill's estate under the Revenue Act of 1918 (40 Stat. 1057) at the time of its repeal by the Act of 1921 (42 Stat. 227), and that the repealing Act saved only *accrued* taxes. This same question, un-

der Revenue Acts in like terms, was considered and decided by this court in Page v. Skinner (D. C.) 293 F. 468. We rejected the contention as unsound, for the reasons there stated. We therefore think the court did not err in denying relief in that respect.

Defendant in error insists that under the procedure taken in the trial court the record here presents no issue for our consideration. Without repeating here the steps that were taken at the close of the testimony it is sufficient to say we think the plaintiff saved the point that the court's finding was wholly without support, and contrary to proof.

We think the court erred in its finding that the gifts were a part of Mrs. Hill's taxable estate. In that respect the judgment is reversed.