## STOLTZE v. WILLCUTS, Collector of Internal Revenue.

District Court, D. Minnesota, Third Division. Feb. 14, 1933.

Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., for plaintiff.

Lewis L. Drill, U. S. Dist. Atty., and M. W. Goldsworthy, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., for defendant.

JOYCE, District Judge.

The above-entitled action at law was tried before the court pursuant to a special setting thereof commencing on the 6th day of July, 1932, the parties having by stipulation waived trial by jury and agreed that the issues should be submitted to the court for determination. There were the following appearances: Messrs. Doherty, Rumble, Bunn & Butler for the plaintiff; and Mr. Lewis L. Drill, United States District Attorney, and Mr. M. W. Goldsworthy, Special Attorney, Bureau of Internal Revenue, for the defendant.

This is a suit brought by the plaintiff as surviving executor of the estate of Fred H. Stoltze, deceased, seeking to recover an alleged overassessment and overpayment of estate tax in the principal amount of $126,108.33 and interest of $12,606.99, or a total of $138,715.32, upon which the plaintiff seeks interest from April 13, 1931; this being the date of payment of the deficiency assessment in question.

The defendant prays that the plaintiff take nothing, that his complaint be dismissed, and asks such other relief as may be appropriate in the premises.

From the admissions contained in the pleadings or made in open court, and from the evidence adduced on trial I find the following to be the facts:

I. Plaintiff is surviving executor of the estate of Fred H. Stoltze, deceased. Defendant is, and at the dates herein mentioned was, collector of internal revenue for the district of Minnesota. Fred H. Stoltze, a resident of Hennepin county, Minn., died May 21, 1928, leaving a last will and testament, which was admitted to probate by the probate court of said county on June 18, 1928. John R. Stoltze (the plaintiff) and Hovey C. Clarke, named in said will as executors, were thereupon appointed as such by said probate court and immediately qualified. Said Hovey C. Clarke died on April 10, 1931. Thereafter, on June 30, 1931, an order was duly entered by said probate court whereby, among other things, John R. Stoltze (the plaintiff), as surviving executor, was authorized to continue the administration of said estate of Fred H. Stoltze to completion. Said administration is still pending uncompleted in said probate court. (Admitted in amended answer.)

II. Said Fred H. Stoltze left personal property subject to probate and subject to estate tax, of the value at the date of his death of (gross) $1,425,526.57. (Admitted.)

III. Said Fred H. Stoltze had likewise prior to his death made four certain gifts of property as follows:

Item 1. On March 30, 1927, he gave forty-nine shares of the capital stock of F. H. Stoltze Securities Company (a corporation) to John R. Stoltze. John R. Stoltze is the only son of Fred H. Stoltze. The value of said stock at the date of death of Fred H. Stoltze was $972,670.58.

Item 2. On March 30, 1927, he gave two shares of the capital stock of F. H. Stoltze Securities Company to Grace B. Stoltze. Said Grace B. Stoltze is the wife of John R. Stoltze. The value of said stock at the date of death of Fred H. Stoltze was $39,700.84.

Item 3. On April 15, 1927, he gave to John R. Stoltze $250,000 face amount of accounts receivable due him from State Lumber Company, a corporation. The value of said accounts at the date of death of Fred H. Stoltze was $250,000.

Item 4. On May 5, 1927, he and the other stockholders of F. H. Stoltze Securities Company caused said corporation to transfer to Mrs. Maud A. Chadwick 500 shares of the preferred stock of United States Steel Corporation owned by it. Mrs. Maud A. Chadwick is the sister of the deceased wife of Fred H. Stoltze. The value of said stock (ex-dividend) at the date of death of Fred H. Stoltze was $72,125, and a dividend amounting to $875 had theretofore been declared on it, making a total value, including said dividend, of $73,000.

(All in dispute except as to the deliveries.)

Said gifts were in each case by outright conveyance, and took effect in possession and enjoyment forthwith on their several dates.

IV. Said Fred H. Stoltze was not in contemplation of death at the time any of said four gifts were made.

None of said four gifts was made by him in contemplation of death.

The three gifts to John R. Stoltze and his wife (items 1, 2, and 3) were made simultaneously with the return of John R. Stoltze to Minneapolis and with his assumption of important responsibilities in the conduct of his father's business, and were made, on account of that return, to give the son an interest or stake in the business he was to manage, and to insure his continued interest in it. A subordinate purpose of these gifts was to divide the property and its income among three taxpayers and so to reduce the total income taxes payable on account of it.

The fourth gift, to Mrs. Maud A. Chadwick, was made by Fred H. Stoltze in order to carry out the wishes of his wife, then recently deceased, who was Mrs. Chadwick's sister, and to insure to Mrs. Chadwick an immediate income. (Disputed.)

V. On or about February 1, 1929, the executors filed their return for federal estate tax. In said return they did not include the value of the four gifts above stated in the gross estate or in the net estate, but they reported that they had been made, and in that connection made in said return the statement set out in paragraph V of the complaint. (See Plaintiff's Exhibit 1.)

VI. After the filing of said return, the same was the subject of audit and investigation in the Treasury Department and of conference between that Department and the representatives of the estate. Agreement was reached as to the value of the property passing under the will (which was correctly fixed at $1,425,526.57, gross); as to the values of the properties transferred by the four gifts (which were correctly fixed at the figures stated in paragraph III of these findings); and as to the amount of the allowable deductions from the gross estate (which were correctly fixed at $118,277.22 total). The Commissioner of Internal Revenue determined, in accordance with section 302 of the Revenue Act of 1926 (26 USCA § 1094), that the value of the four gifts mentioned should be included in the gross estate. The executors declined to accede to that determination. This was the only outstanding difference between the parties. Accordingly a "closing agreement" under section 606 of the Revenue Act of 1928 (26 USCA § 2606) was prepared, was signed on December 8, 1930, by the executors, and on February 17, 1931, by the Acting Commissioner of Internal Revenue, and was approved by the Secretary of the Treasury on February 17, 1931. A correct copy of said closing agreement is set out in paragraph VI of the complaint. It fixed the total estate tax at $199,188.28, subject to (1) a credit of not to exceed 80 per cent. thereof for state estate, inheritance, legacy, or succession taxes paid; and (2) the executors' contention, which was saved, that the tax was excessive by so much of the amount fixed as resulted from the inclusion of the four gifts mentioned in the gross estate. (Not admitted on pleadings, but no substantial dispute as to what happened. See Plaintiff's Exhibits Nos. 2, 3, 4, 5, 6, and 7.)

VII. Following the determination mentioned in the last paragraph, the Commissioner of Internal Revenue, on or about March 7, 1931, assessed deficiency federal estate tax against the said executors in the principal sum of $125,725.48 (being said total estate tax of $199,188.28 found by him less assessments theretofore made), and also assessed interest on the said $125,725.48 from May 21, 1929, to January 21, 1931, in the sum of $12,606.99, aggregating $138,332.47. On or about March 14, 1931, the defendant served on the plaintiff defendant's notice and demand for payment of said deficiency tax, and on April 13, 1931, the plaintiff paid the same to the defendant, under protest, in the amount last stated. (Admitted in amended answer.)

VIII. Pending the proceedings described in the last two paragraphs, the Minnesota inheritance tax payable on account of said estate was determined by said probate court to be the sum of $53,151.23, which amount was paid by the said executors to the treasurer of Hennepin county, Minn., and appropriate proof thereof filed with the Treasury Department. Thereafter, and in the month of July, 1931, the Commissioner allowed credit for said payment, and so advised the plaintiff.

Thereafter, and after the commencement of this action, the state of Minnesota assessed additional estate tax against the said estate in the sum of $5,312.73, which was paid by the plaintiff December 2, 1931. Plaintiff filed claim for credit of that amount against the federal tax and refund, which was allowed and refund paid. The total credit under the law for state inheritance and estate taxes paid was therefore $58,463.96, which has been allowed. (Not formally admitted; no substantial dispute. See Plaintiff's Exhibits 8 and 9.)

IX. Estate tax has been assessed by the Commissioner of Internal Revenue against the said estate as follows:

February, 1929, P. 300, L. 7 (Principal).... $ 70,627.89
January, 1930, P. 300, L. 7 (Principal)...... 2,834.91
March, 1931, P. 300, L. 0 (Principal)........ 125,725.48
March, 1931, P. 300, L. 0 (Interest)......... 12,606.99
June, 1931, P. 300, L. 1 (Interest)........... 409.15

Total Assessments....................... $212,204.42

Against said assessments certificates of overassessment have been issued as follows:

Schedule MTR 7045 (Minnesota inheritance tax) ........................................ $53,151.23
Schedule MTR 9006 (Minnesota estate tax, $5,312.73; and interest adjustment, $196.-67) ........................................ 5,509.40

Total Overassessments Certified........ $58,660.63

The total net assessment of estate tax (including interest) made is therefore $153,-543.79, of which $140,724.32 is principal and $12,819.47 is interest. (No dispute as to facts, though not formally admitted. See Plaintiff's Exhibits 8 and 9.)

X. The executors of the said estate, and the plaintiff as surviving executor, have paid to the defendant on account of estate taxes assessed the following sums:

| Date of Payment | Amount Paid |
| --- | --- |
| May 17, 1929 (on returned tax).............. | $ 14,125.58 |
| May 17, 1929 (deficiency assessment)....... | 2,834.91 |
| April 13, 1931 (deficiency assessment, principal) ................................... | 125,725.48 |
| April 13, 1931 (deficiency assessment, interest) ................................... | 12,606.99 |
| June 3, 1931 (balance returned tax, principal) ................................... | 3,351.08 |
| June 3, 1931 (balance returned tax, interest) ...................................... | 409.15 |
| Total Estate Taxes Paid................ | $159,053.19 |

Against said payments there has been refunded to the plaintiff, on account of credit for said Minnesota estate tax ($5,312.73) and interest adjustment ($196.67), the sum of $5,-509.40.

The net total estate taxes paid is therefore $153,543.79, being the same amount as the total net assessment. Of said net payments $140,724.32 were principal and $12,819.47 interest. (No formal admission, though substantially admitted. See Plaintiff's Exhibits 9, 10, 11, 12, and 13.)

XI. If the values of the said four gifts are excluded from the gross estate, the estate tax (principal) properly assessable is $14,-615.99, calculated as follows:

| | |
| --- | --- |
| Value of gross estate, excluding four transfers ................................. | $1,425,526.57 |
| Total deductions........................... | 118,277.22 |
| Net estate for tax...................... | $1,307,249.35 |
| Gross estate tax on this amount.......... | $ 73,079.95 |
| Credit for Minnesota taxes paid.......... | 58,463.96 |
| Estate tax............................. | $ 14,615.99 |

The principal amount of estate tax assessed and paid was therefore (on the assumption stated) excessive as follows:

| | |
| --- | --- |
| Principal assessed and paid................ | $140,724.32 |
| Principal assessable....................... | 14,615.99 |
| Principal overassessed and overpaid... | $126,108.33 |

On the same assumption, the interest assessed in March and paid in April, 1931, in the sum of $12,606.99, was neither assessable nor payable, for the reason that the deficiency assessment of principal made at the same time and on which the interest was calculated was itself not assessable; the total tax payable being more than covered by assessments theretofore made.

If the four gifts are excluded, therefore, the total overassessment and overpayment of estate tax is:

| | |
| --- | --- |
| Principal ................................... | $126,108.33 |
| Interest ................................... | 12,606.99 |
| | $138,715.32 |

—on which the taxpayer would be entitled to interest from April 13, 1931, the date of payment of the deficiency assessment in question. (In substance a compilation, excluding the four gifts.)

XII. On or about April 22, 1931, the plaintiff filed with the defendant a claim for refund of the part of the estate tax resulting from the inclusion of said four gifts in the gross estate, in the aggregate sum of $138,715.32. A true copy of said claim is set out in paragraph XII of the complaint. On September 14, 1931, the Commissioner of Internal Revenue rejected the said claim in its entirety. This action was instituted within six months thereafter. (Not in substantial dispute. See Plaintiff's Exhibit 14.)

On the foregoing findings of fact I make the following conclusions of law:

I. That so much of section 302 of the Revenue Act of 1926 as provides that said four gifts "shall be deemed and held" to have been made in contemplation of death, notwithstanding the facts are to the contrary, operates to deprive the plaintiff of his property without due process of law, in violation of the Fifth Amendment to the Constitution, and is therefore void.

II. That none of said four gifts should have been included in the gross estate for the calculation of estate tax.

III. That the plaintiff is entitled to judgment against the defendant in the sum of $138,715.32, with interest at 6 per cent. from April 13, 1931, until paid. Judgment will be entered accordingly.

To all of which an exception is accorded the defendant.

### Memorandum.

As I view it, there is necessary to be considered the question as to whether the gifts involved in this controversy were made by one

capable of making them, were made outright, were intended to and did take effect at once, and were absolute. If so, they are taxable only if made "in contemplation of death."

The tax in question is levied by section 302 (c) of the Revenue Act of 1926 (26 US CA § 1094 (c), as follows:

Section 302: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated— \* \* \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. \* \* \* "

See in this connection Treasury Regulation No. 70 reading as follows: "Art. 16. Nature of Transfer.—The words 'in contemplation of death' do not mean, on the one hand, a general expectation of death such as all persons entertain, nor, on the other, is the meaning limited to an expectation of immediate death. A transfer, however, is made in contemplation of death wherever the person making it is influenced to do so by such an expectation of death, arising from bodily or mental conditions, as prompts persons to dispose of their property to those whom they deem proper objects of their bounty. Such a transfer is taxable, although the decedent parts absolutely and immediately with his title to and possession and enjoyment of the property."

Further provisions of section 302 (c) provided that all gifts in excess of $5,000 in value and made within two years prior to death, "shall be deemed and held to have been made in contemplation of death within the meaning of this chapter." This conclusive presumption was held void by the Supreme Court of the United States in Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772. Prior to 1926, the Revenue Acts contained provisions that all gifts of a material amount, made within two years of death, shall be deemed to have been made in contemplation of death, "unless shown to the contrary." This prima facie assumption was of course valid. However, by the act of 1926 it was made applicable only to gifts made prior to the enactment of such act (section 302 (c), third sentence); gifts subsequent to the enactment of the act being covered instead by the conclusive presumption

now declared to have been unconstitutional. The gifts under consideration in this case were made after the act of 1926, and therefore on the face of the act not subject to any presumption. It may be assumed, however, that, since the act of 1926 was an amendment of the prior act, its invalidity might leave the old law in effect and the prima facie assumption operative. The plaintiff, therefore, would have the burden of proof which fixes the duty of producing some evidence to the contrary and which when done the inference ends and the question of fact arises under all of the evidence. See Flannery v. Willcuts, 25 F.(2d) 951 (C. C. A. 8th), and the cases therein cited. See, also, Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184; Neal v. Commissioner of Internal Revenue, 53 F.(2d) 806 (C. C. A. 8th).

We now have before us the applicable statutes, the determination of where rests the burden of proof, and there is then approached a consideration of whether or not the four gifts made by Fred H. Stoltze, first, were actually made, were capable of being made, and were intended to and did take effect at once; and, second, if so made, were such gifts made by Stoltze in contemplation of death. My consideration of the evidence suggests an affirmative answer to the first question and a negative answer to the second.

There is much to support the conclusion, in my opinion, that the division of the Stoltze Securities Company stock by the gift to John R. Stoltze and his wife, Grace, leaving after such gifts 49 per cent. in Stoltze, 49 per cent. in Stoltze, Jr., and 2 per cent. in Grace Stoltze, his wife, was deliberate and actually consummated, and by one qualified to make such division. I do not understand that the delivery of the gifts is questioned. The accounts of the father and John R. Stoltze and his wife were set up on the books of F. H. Stoltze Securities Company, which was organized in 1924 and which held the securities of the Stoltze Companies, as well as those of other companies in large quantities; all of the stock of the Securities Company being owned by F. H. Stoltze until the making of the division in question in March, 1927. The detail of earnings on these gifts is shown in Plaintiff's Exhibits 52–A, 52–B, and 52–C, taken from the F. H. Stoltze Company books. Defendant's Exhibit A–7 is a photostatic copy of the original and amended income tax return for the calendar year 1927 filed on behalf of John R. Stoltze. The dividends received by the son on his 49 per cent. of the

Stoltze Securities stock, shown on Exhibit 52–B, are reflected on the third page of the income tax return, and it appears that, after the gifts were made, the son and his wife were treated as stockholders of the Stoltze Securities Company. No question arises as to the earnings, the method of their recording, or their return on form 1040.

Plaintiff's Exhibit 75, being a stipulated extract from a journal from the State Lumber Company, reflects the personal accounts of F. H. and John R. Stoltze following the gift to the latter on April 15, 1927, of $250,-000 face amount of accounts receivable due the father from the State Lumber Company, and substantiates the transfer as claimed.

The Chadwick transaction involving the gift to Mrs. Maud H. Chadwick of 500 shares of preferred stock of U. S. Steel on May 5, 1927, was pursuant to what was apparently a desire entertained for some time by F. H. Stoltze to provide Mrs. Chadwick with a fixed income; she being a sister of his deceased second wife. He so told Mrs. Chadwick's husband on his way home from the South while in Chicago, where the Chadwicks lived. I doubt if in the state of the record serious objection will be urged as to the integrity of this transaction.

It is to be noted in connection with the accounts of the various companies controlled by F. H. Stoltze that they were kept in a manner as best suited Mr. Stoltze's convenience and views. Many highly important transactions were merely noted on cards showing the date of acquisition of the securities, dividends received, date when sales were made, and many carry on their face indorsements to the effect that the stock was carried in the name of F. H. Stoltze Securities Company. I think they are sufficient to show the manner whereby the business was conducted, and there is other supporting evidence which leads to the conclusion that the Stoltze Securities Company had large assets and its stock possessed the substantial value disclosed in the findings of fact. It might be suggested that as to enterprises so extensive such holdings merited a more comprehensive system of bookkeeping, but those familiar with the accounts who testified at the hearing had no difficulty in explaining not only the book entries but the significance of the card exhibits. The method appears to have been fully sufficient. We must take the situation as it existed throughout the period affected by this litigation.

An outstanding case in which the subject "contemplation of death" is discussed is United States v. Wells, 283 U. S. 102, wherein the court at page 117, 51 S. Ct. 446, 451, 75 L. Ed. 867, said:

"As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death. [The Wells case arose under an application of the provisions of the Revenue Act of 1918, 40 Stat. 1057–1097.] But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor.

"As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. * * *

"The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.' * * *

"It is sufficient if contemplation of death.

be the inducing cause of the transfer whether or not death is believed to be near."

See, also, Flannery v. Willcuts, supra, and authorities therein cited, and Rea v. Heiner (D. C.) 6 F.(2d) 389, 392, which latter case involved the assessment of taxes under section 402, par. (c) of the Revenue Act of 1918 (40 Stat. 1097) and wherein there was noted with approval as follows: " 'It is only when contemplation of death is the motive without which the conveyance would not be made, that a transfer may be subjected to the tax.' That is, the expectation of death must be the direct, specific, and immediate animating cause of the transfer."

If a present apprehension of death induced from some existing bodily or mental condition be absent, "there is not that contemplation of death intended by the statute, especially when another adequate motive actuating the gift is shown." Rea v. Heiner, supra.

The foregoing are the legal principles as I see them applicable to this branch of the case. It becomes necessary to apply them to the evidence.

Fred H. Stoltze died on May 21, 1928, age sixty-nine years. He survived two wives; his second wife having died February 12, 1927, following a lingering illness. He was apparently greatly devoted to Mrs. Stoltze, and her death brought him deep grief. He had been a man of great physical strength and mental vigor. He was dominant, arbitrary, unreasonable, and highly successful in business. He had acquired a large fortune in various milling, lumber, and land enterprises and investments. He undertook to exercise a personal control over all of his interests with the executive assistance of a trusted employee named Landmark, who by some witnesses has been described as a chief clerk and by others as a confidential assistant or secretary. In any event, Landmark filled an important and vital status in the Stoltze scheme of affairs, scattered as their interests were. Landmark had been with Stoltze for many years, and in the disposition of many matters exercised complete discretion.

John R. Stoltze was an only son by the first wife. The son married in 1921, following which he lived for some eight years in Shreveport, La., where he was engaged in the oil business, but in which his father had no interest, nor did he then have monetary interest in the father's affairs. In fact, it appears that at such time the father and son did not get along well.

F. H. Stoltze for many years had been afflicted with interstitial nephritis. He had an attack early in 1925 of neuritis in his left leg, which finally attacked the other leg. For various periods he had been a sufferer from various ailments. The testimony discloses that from at least 1918 until his death he suffered from diabetes and took insulin for its relief; that early in 1925, following painful periods, he sought medical relief at Rochester, Minn., and in June of that year he there submitted to an operation involving the severing of the sensory nerve in his leg, which he regarded as a serious operation, but which greatly relieved his physical condition and led him to believe, from what his doctors told him, that his future relief was insured from the distress theretofore undergone, and that he would get well, though the operation in a measure crippled him and somewhat retarded his physical activities.

The record discloses no other period or condition until his last illness suggesting that he might have reasonably feared death as being a likely consequence of his condition, and it seems somewhat significant that at such time there is no evidence that he considered the making of, or that he made, any gifts or other disposition of his large properties. The testimony of Dr. McFarland, who attended Mr. Stoltze in 1918 and thereafter, and who had been associated with Dr. Nippert, deceased, at the time of the trial, and who had been Mr. Stoltze's regular physician, showed that their office record disclosed no complaints of pain or trouble after the administration of heavy sedatives following his return from Rochester in 1925 until September, 1927. The doctor stated that on April 7, 1926, Stoltze's blood pressure was 170–90, and a urinalysis disclosed he was sugar free. On September 8, 1927, he had neuralgic pains in his leg; his blood pressure was 160–95, and there was then an absence of sugar and pus in the urinalysis. The next day he was, as the doctor said, "O. K." On October 28, 1927, a urinalysis disclosed an even better situation, and from October 28, 1927, to February 13, 1928, there are no book entries in the doctor's records.

In 1925, when the father had been ill in Rochester, the son came from the South to see him, and found both the father and stepmother ill. In the fall of 1926 he came to Minneapolis to visit his parents. He testifies that he had made up his mind to come North —probably on the tentative suggestion theretofore made by the father that he come back to assist in the father's business. It is important to note at this point that in 1924 the

father was still actively carrying the heavy responsibility of his business, and that in May of that year, when returning from a visit to one of his Montana milling enterprises, he expressed the hope to Mr. Arthur Langley, an insurance engineer who made the trip West with him, that "he wished Jack (his son) were back to take over the work we were doing." This is the first time, so far as the evidence discloses, that he felt the need of his son's co-operation and presence. This was about two years before Landmark's death and four years before Stoltze's death. Again in May, 1926, in another conversation with the same witness regarding insurance affairs, he told Langley with reference to some matter wherein his decision was sought by Langley "that Jack would be back and the matter in question would be taken up by him."

When Landmark died in 1926, it took a trusted and active aid out of the Stoltze organization, and it became important, if not absolutely necessary, that somebody take on added responsibilities, and immediately the son was inducted into the business and started to work for the F. H. Stoltze Land Company as well as various of the lumber enterprises. As fast as he familiarized himself with the business, there were additional responsibilities assumed. In certain of the enterprises the young man was given shares of stock to permit of his becoming a director, and the gifts in question made to him and his wife had as their underlying motive and purpose, as I view it, a desire to get the son back to assist him in the management of six or seven large going enterprises, the idea and plan for which he had expressed two years before. In this connection, as disclosing motive, it is important to keep in mind the testimony of witness Doney, who did tax work for Stoltze, Sr., who stated that F. H. Stoltze in December, 1926, told him that he wanted to give Jack a substantial interest in the business "so Jack would be justified in coming." It appears that the father wanted to impress upon the son that his responsibilities and obligations were to be large and important. There was then present also the natural desire for the society of the son and his family, towards whom he evidenced devotion and affection.

After he recovered from the shock of his wife's death in February, 1927, the testimony shows that Mr. Stoltze was interested in the general news, market quotations, horse racing, bridge, as well as his business affairs; that he possessed a good appetite, and while he had a prescribed diet he paid no attention to it, overate, and did about as he pleased. In brief, for one of his temperament he acted in a natural manner. The Rochester operation had left a lameness which required the use of a cane, and certain physical conditions required that assistance be rendered him, such as getting in and out of his auto and in and out of the bathtub. He was not a well man, but his great physical strength did not leave him easily, and he still possessed a vigorous and decisive mentality, and, while unreasonable and arbitrary, he still successfully carried on his business affairs, and nothing is there to indicate that his attitude towards his numerous and scattered enterprises, their operation and control, in any manner suggested his belief that death was approaching—near or distant. In the summer of 1927 he decided to go into the business of raising orchids on a large scale. He converted his extensive home gardens and greenhouses for that purpose, and undertook the propagation of these flowers, which the evidence shows take four or five years to mature from seedlings, a fact which it may be presumed he knew. In 1927 he had his dentist make him another set of false teeth, though the set which he had made in 1925 was apparently still satisfactory. He traveled much, and, while no longer able to hunt or play golf as had been his custom, he did retain his interest in outdoor affairs. His chauffeur, who worked for him since April, 1926, testified that he would go to his office about 9:30 in the morning, leaving about noon. After lunch he would either return to the office or go to his club. That he would be called for between 5:30 and 6. That he had little difficulty in getting about. That he enjoyed fishing and outdoor life. That he took numerous walks with his son, and that the course of conduct outlined in 1926 with reference to his physical movements was substantially the routine followed in 1927 when he went to Florida, from where on his return he made the gifts in question. In August of that year he went to Wisconsin on an outing, where he fished every day, weather permitting. That he played bridge every evening until about 10 o'clock on this trip. The witness Goetz, at whose home he stayed on the trip, stated that aside from his bereavement he regarded him as normal in mental attitude. He continued his bridge activities at his home on his return, and derived great enjoyment therefrom, though he dictated the rules and methods to be adopted by the other players. His grandchildren were of great interest to him, as were general business conditions, and he continued to assert his interest in agriculture and flow-

ers. Apparently throughout this period he was not disturbed as to his future well-being. His actions would seem to indicate that he felt that the operation in 1925 at Rochester had realized the hopes his doctors then expressed.

No question exists that in his last illness, culminating in his death in May, 1928, nurses and doctors were in attendance and that he suffered acutely. In March of that year he told one nurse that she would have to get a new job, as he was going to have a funeral. The expressions then made by him as disclosing his then appreciation of his condition were at least a year after the making of the four gifts in question.