## BROWN et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 1124.

Circuit Court of Appeals, Tenth Circuit.

Nov. 28, 1934.

Lewis A. Dick, of Denver, Colo. (Robert G. Bosworth and Pershing, Nye, Bosworth & Dick, all of Denver, Colo., on the brief), for petitioners.

Warren F. Wattles, Sp. Asst. to the Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, and F. E. Youngman, Sp. Assts. to the Atty. Gen., on the brief), for the Commissioner.

Before McDERMOTT and BRATTON, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

On April 10, 1930, David Brown, without consideration, transferred to his wife 3,487 shares of stock of the value of $266,163.75. He was 73 years old; the Mayo Clinic, in the summer of 1929, advised him that, except for a high blood pressure, he was in excellent health; they advised him to forget his blood pressure except to be moderate in exercise and eating. In September he passed a kidney stone, which laid him up for part of a day. Indigestion bothered him, and in January, 1930, he went to a sanitarium in California, where he dieted and rested for three weeks, but was not confined to his bed. Upon his return to Denver his indigestion continued and upon his doctor's insistence he went to a hospital for a few days for examination and observation. Upon coming out, he made the gift in question and revised his will in a minor particular. He returned to the hospital for one day to complete the examination. This examination disclosed the cause of the indigestion, an obstruction of one kidney remedied by dilation. He died June 29, 1930, of interstitial nephritis, uremia and arterial sclerosis as contributing causes.

The statute applicable. (Revenue Act 1926, § 302 (c), 26 USCA § 1094 (c) taxes transfers "in contemplation of or intended to take effect in possession or enjoyment at or after his death." That section contained a clause conclusively presuming that gifts within two years were in contemplation of death, but this was held to be unconstitutional. Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772. The transfer here being absolute and presently effective, but one question exists, unaided by statutory presumption, Was the transfer made in contemplation of death? The exhaustive opinion of the Supreme Court of the United States in United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867, further narrows the inquiry. The case then, as we see it, is this:

Was the idea of death, thought by the donor to be near or distant, the impelling motive of the gift? Or did the motive find its source in purposes associated with life? Was it an effort to provide for his family after his death, or to protect them from poverty during his life? If the record leaves the answer to these questions in fair doubt, then the order must be affirmed; for if there is dispute in the testimony, or if reasonable men may differ as to the conclusion to be drawn from undisputed testimony, the finding of fact of the Board may not be reviewed by the courts. The evidence in this case is undisputed; moreover no suspicion is directed at the integrity of the facts related by the witnesses; and much of the most significant evidence is a matter of record or stipulated. Our inquiry is thus limited to the query of whether the motive for the gift unmistakably was one associated with continued life.

The Board found that the motive for the transfer came into being in March, 1930, when "he told his wife that he proposed to give her some stock of substantial value," and that he carried out his intent in the interval between visits to the hospital. If the record bore out that fact, together with those heretofore narrated, and no more, a more difficult case would be presented. But the uncontradicted evidence, by unimpeachable witnesses, proves that Mr. Brown formed a general plan to distribute his property more than twenty years before his death, and decided to make the particular gift in question long before March, 1930, which was the date upon which he decided upon what stock to transfer, and that the reason for it was to protect his wife against the vicissitudes of stock market speculations in which he was engaging, and which he realized might wipe out his own fortune. For support of this statement, we look to the record:

In 1907 he gave his wife rental real estate then valued at $42,000; in 1910 real estate in Aspen, Colorado, valued at $12,800; in 1917 a residence in Denver valued at $50,-000; in 1929, $141,000 in cash. In 1919 he gave each of his two daughters $70,000 in cash, and in 1923 $50,000 in cash. These gifts total $485,000. Mrs. Brown testified as to a conversation in 1919: "Mr. Brown also repeated what he had often said, that he wanted me to be independent, to have my own income so that if anything happened to his investments I would not be affected." In 1917 he told his lawyer he wanted to provide for his wife "so that she would be entirely independent in the event that anything happened to his estate or his property." The Board laid this evidence to one side with the observation that they were no more than gifts which any wealthy and generous man would make to his wife and daughters. The record does not disclose his wealth when these gifts were made, so we do not know whether they were a substantial part of his then holdings.

Such gifts cannot be treated as presents only. During the same years he gave his wife a set of sables, valued at $5,000; diamonds worth $12,500; a tea set which cost $1,250 and a wrist watch worth $500. These were presents in the colloquial sense; the gifts of money and real estate were not; they were provisions for their support during his lifetime, prompted by the motive instanced by Chief Justice Hughes in the Wells Case as one peculiarly associated with life rather than death, that the objects of his bounty might be "independently established with competencies of their own." Not only is this motive apparent from the nature of the gifts, but the Board so found in its findings of fact. The finding is:

"For many years prior to his death it was the custom of the decedent to make substantial gifts to his wife and other members of his family in order that they might have property and incomes of their own."

The decedent's general plan, reaching back to middle age, was to provide his family with independent incomes during his life. In arriving at its conclusion on the ultimate fact, the Board in its opinion gave but scant consideration to its own finding of fact in this regard.

That the particular gift in question was but a carrying on of this general plan, and was determined upon long prior to the date set by the Board, is likewise indisputably proven. Again we turn to the record:

The stock market crash occurred in October, 1929. Mr. Brown was dealing actively in stocks. Being a man of wide experience and much sense, he realized his fortune might be lost in that vortex; but while willing to stake his own future on the turn of the wheel, he was not willing to risk his wife's comfort in her declining years. In the late fall of 1929 he so told Mr. George L. Nye, his confidential counsel for many years. Mr. Nye testified:

"He stated to me at that time that he intended to make a direct gift to Mrs. Brown and referred to it as the matter which he had previously discussed with me on various occasions, intending thereby, by making the gift, to make her entirely independent, to give her enough of a personal estate so that she would be independent and so that through her and her property his minor children would be amply protected 'even if he lost his shirt' on the stock market, as he used to express it."

He discussed it again with Mr. Nye shortly prior to the transfer of the stock:

"The substance of what he said was this: 'You know I told you that I was going to settle'—I think that is the word he used—'some property definitely on Ruth. At first I thought I would use a certain stock'—mentioning it—'and then I concluded that I would use a certain other stock. Now I have made up my mind what I want to do.' That was practically all that he said about the matter at that time. He did tell me, when I was actually drawing the will the latter part of March, that he proposed to give her the Electric Bond and Share stock."

Mr. Nye was for many years prior to his death, a lawyer of irreproachable standing at the bar of this court. There is not, and could not fairly be, a breath of suspicion that this testimony is not true. His testimony is fully corroborated by Mrs. Brown.

The record clearly discloses, therefore, that Mr. Brown decided upon this transfer in the fall of 1929, and not in March, 1930, as the Board found. What happened in March, 1930, was that at that time he decided what stock he would use in making the provision which he had determined upon late in 1929. This testimony was overlooked. Since the motive for the gift dates back of the time it was consummated, the circumstances of April, 1930, are not so important. Stress is laid on the fact that he made a new will about the time the transfer was made. The Board found "he made a new will disposing of his entire estate." But the prin-

cipal change made was to substitute individuals for a trust company as executor, a change readily referable to the uneasiness then existing concerning banks and trust companies. The Board did not find, as the evidence disclosed, that Mr. Brown changed his will so often that his propensity in this regard had become a joke in his lawyer's office. Nor was his physical condition such as to alarm him, but quite the contrary. He was an outdoors man, impatient of disease and doctors. He had gone through the Mayo Clinic at his wife's insistence, who was there for her own health. The report of the doctors there was encouraging. The doctors in California told him "he had many years before him." He was impatient of his indigestion, remarking that it was "a hell of a note that a man who had roughed it as he had and been brought up on sow belly and beans and corned beef and cabbage couldn't eat what he wanted to." He went to the hospital for examination in 1930 because his doctor practically forced him to go; and the indigestion was cured thereby. He drove his car on a tour through California after he left the sanitarium. In August, 1929, when he was 72 years old, he went on a horseback trip with his doctor, a much younger man, and his doctor testified: "Mr. Brown was very active. I could not keep up with him on the horse. He wore me out." His doctor since 1907 never saw him in bed except the afternoon he passed the kidney stone. In June, 1930, he was planning a difficult pack trip for the summer of 1931, and trying to interest his lawyer in the purchase of a duck-shooting lake. The picture is a clear one; he was a rugged, hard, outdoors man whose thought of death, when he thought of it at all, was of something a long way off.

We see no escape from the conclusion that this transfer was but another step in his life-long plan to provide securely for his family during his lifetime and to protect them from the risks attendant upon his business. Death was not the impelling motive; in fact, was probably not even in his thoughts. A contrary finding cannot stand. United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867; Lippincott v. Commissioner (C. C. A. 3) 72 F.(2d) 788; Commissioner v. Nevin (C. C. A. 3) 47 F.(2d) 478, certiorari denied

Burnet v. Nevin, 283 U. S. 835, 51 S. Ct. 485, 75 L. Ed. 1447; Flannery v. Willcuts (C. C. A. 8) 25 F.(2d) 951; Harnischfeger v. Commissioner, —— B. T. A. —— (decided October 3, 1934), are cases where gifts, under facts not as clear as these, were held to be not in contemplation of death. As to the court's duty where the Board's finding overlooks uncontradicted evidence, or its conclusion is contrary to its findings, see Lippincott v. Commissioner, supra; Jones v. Helvering, 63 App. D. C. 204, 71 F.(2d) 214; Flannery v. Willcuts, supra.

The other item involved is negligible in amount, and grows out of a deduction from the gross estate of $2,576.70 general property taxes paid by the executors. The facts as stipulated are:

Brown died in June, 1930. In 1931, while the estate was open, general property taxes for the year 1931 were assessed upon real and personal property then owned and held by the estate. They became a lien on the property as of April 1, 1931, and were payable in 1932. They were paid by the executors when due, the estate still being open, and their payment approved by the court of probate.

The Commissioner disallowed the deduction and the Board affirmed, relying upon the district court opinion of Hill v. Grissom, 299 F. 641, and its early opinion in Appeal of Chas. B. Shelton, 3 B. T. A. 809. But in the Shelton opinion the Board noticed a square conflict between the Grissom Case and Thompson v. United States (D. C. Minn.) 8 F.(2d) 175, and disavowed the ruling in the Grissom Case. In its opinion in this case, the Board says that the Grissom Case is analogous to the facts here; but in the Shelton Case it pointed out, correctly, that the taxes had accrued and were a personal liability and a charge upon the estate at the time of the death of the testator. In the case at bar the taxes were levied against the executors for the year after the death of the testator, and were against property "then owned and held by the estate." Cases [1] involving taxes which were a debt of the decedent or a charge against his property when he died fall under another provision of the statute and have no application here. Likewise, cases [2] where

---

[1] Graham v. Russell, 152 Ind. 186, 52 N. E. 806; Tomlinson v. City of Adel, 169 Ga. 758, 151 S. E. 482; Succession of Holstun (La. App.) 141 So. 793; Van Hoozer v. Myers, 98 Okl. 243, 224 P. 977; County of Washington v. Estate of Jefferson, 35 Minn. 215, 28 N. W. 256.

[2] Miller v. Oil City Iron Works, 184 Ark. 900, 45 S.W.(2d) 36; State v. Mississippi Valley Trust Co., 209 Mo. 472, 108 S. W. 97. In Evans v. Carroll, 167 Ga. 68, 144 S. E. 912, a district court appointed a receiver for an estate. A state tax officer claimed priority against the re-

the executor paid taxes, or incurred other expenses, on real estate which passed directly to the heirs and never came into the possession of the executor have no bearing.

The pertinent part of section 303 (a) (1), Revenue Act 1926 (26 USCA § 1095 (a) (1), reads:

"For the purpose of the tax the value of the net estate shall be determined—

"(a) In the case of a resident, by deducting from the value of the gross estate—

"(1) Such amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property (except, in the case of a resident decedent, where such property is not situated in the United States), to the extent that such claims, mortgages, or indebtedness were incurred or contracted bona fide and for an adequate and full consideration in money or money's worth, losses incurred during the settlement of the estate arising from fires, storms, shipwreck, or other casualty, or from theft, when such losses are not compensated for by insurance or otherwise, and such amounts reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent, as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered, but not including any income taxes upon income received after the death of the decedent, or any estate, succession, legacy, or inheritance taxes."

Congress contemplated that the tax should be measured by the net estate passing by the death. It authorized a deduction for any state taxes due at death by the words "claims against the estate * * * or any indebtedness in respect to property." Congress also distinctly contemplated the deduction of general property taxes levied during the administration of the estate, for in the latter part of the section, devoted to expenses and losses incurred during the settlement of the estate, it excludes taxes upon income received after death, and succession taxes which only arise after death. By excluding income and succession taxes only, general taxes are included. The Regulations recognize this intent of Congress. Art. 37, Reg. 70, (2) provides:

"Where assessed during the administration of the estate, and the taxes are a proper administration expense, deduction of the entire amount may be taken. (See Arts. 32 and 35.)"

In drafting this regulation, the Commissioner gave no significance to the words of exclusion in the statute which at least impliedly authorizes the deduction of general taxes, for if such taxes may only be deducted when they are "a proper administration expense," then the deduction is authorized by the phrase "administration expenses" in the first part of the section. Whether this takes an unwarranted liberty with the statute we need not inquire; for we are satisfied that taxes laid against property for the period in which executors own and hold it, and paid by them, are a proper administration expense. By Art. 32, Reg. 70, the Commissioner, in his definition of "Administration Expenses," ruled that those "expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, where it is impossible to effect immediate distribution to the beneficiaries."

One of the first obligations of an executor is to prevent waste of the estate in his possession. Galligan v. Thomas S. Hayden Realty Co., 62 Colo. 477, 163 P. 295; Garver v. Thoman, 15 Ariz. 38, 135 P. 724. If the executors here had not paid these taxes when due, the estate would have been wasted by the accrual of penalties and interest and costs of tax sale. The executors would have been derelict in their duty if they had not paid them, since they then owned and held the estate. The taxes were therefore an expense "necessarily incurred in preserving and distributing the estate." Woerner, in his work on The American Law of Administration, p. 1174, classes "taxes assessed against property in his [the executor's] charge" as a proper administration expense.

The taxes were a proper administration expense in Colorado.[3] Their payment has been approved by the state court; the taxes were not a claim against the decedent, since they accrued after his death. The payment was therefore necessarily approved as a part of the administration expense. Section 5262, Comp. Laws Colo. 1921, provides:

"Such executor, administrator, guardian or conservator shall list the property, real

---

ceiver's funds for taxes accrued against the administrator. The claim of priority was denied without discussion. The case seems to be without applicability here.

[3] The state law determines such questions. Scott v. Commissioner (C. C. A. 8) 69 F.(2d) 444, 92 A. L. R. 531.

and personal, of the decedent or ward, for taxation, and pay the taxes thereon from any funds of the estate in his hands properly applicable to that purpose, and in case of his wilful neglect or refusal so to do, he and his sureties shall be liable for any damage to such ward, heirs at law or others entitled to or interested in such estate, resulting from such neglect or refusal."

Since the executor must pay them, he must be recouped. Such charges cannot be claims against the estate. He can only be recouped by allowing them as a part of the administration expenses, which they are.

But, it is argued, such taxes are deductible from the income tax paid by the estate. Congress may authorize a deduction of taxes from both income and estate taxes if it chooses. The argument is that it should not. But the argument carries too far, for the Commissioner allows the deduction if the state law classes them as administration expenses. Against that argument of expediency, there is this to be said: The estate tax laws ought to be as uniform in their operation as possible. There is no logic or reason in permitting a deduction in Colorado, where the taxes may be called administration expense, and disallowing the same item in a state where it passes under some other name.

We conclude that the order of the Board is erroneous in both particulars, and it is accordingly reversed.